Teresa M. LINDHAG, Appellant,

v.

STATE of Alaska, DEPARTMENT
OF NATURAL RESOURCES,
Appellee.

No. S–11370.

Supreme Court of Alaska.

Oct. 7, 2005.

Rehearing Denied Dec. 14, 2005.

Michael A. Stepovich, Fairbanks, for Appellant.

David D. Floerchinger, Assistant Attorney General, Fairbanks, Kristin S. Knudsen, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

The Alaska Workers' Compensation Board rejected Teresa Lindhag's request for benefits for certain medical problems allegedly caused by toxic exposures suffered while working in a new state office building. Ms. Lindhag appeals two of the board's orders: the first denied benefits to Lindhag and the second denied Lindhag's petition for rehearing and modification based on newly discovered medical evidence. Because the first order is supported by substantial evidence, and because the second order correctly concluded that Lindhag failed to allege a mistake in fact or change in condition to warrant a new hearing, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Factual History

In 1988 Teresa Lindhag worked as a Clerk Typist for the Alaska Department of Natural Resources (DNR), in Fairbanks. In May 1988 her division moved into a new office building. As stated by the superior court:

> She began to experience illness shortly after the move into the new building. Several other DNR employees complained about the poor air quality in the building. By August 1988, Ms. Lindhag's symptoms included chest pain, difficulty breathing, hoarseness, coughing, congestion, muscle aches, stiff neck, blurred vision, headaches, nausea, vomiting, diarrhea, runny nose and eyes, fatigue, and loss of memory. She began to suspect a connection between her symptoms and her work in the building.

She reported that each time she reentered the work area, her symptoms returned, and more rapidly each time. Her treating physician, Dr. Steiner, agreed that the building was "exacerbating if not causing her symptoms" and removed Lindhag from the workplace by the end of October 1988.

Prior to leaving, Lindhag had filed a notice of occupational injury, which resulted in the state paying Lindhag $230.27 weekly in temporary total disability. (These payments continued from October 1988 to July 1997.) In November 1988 the Alaska Division of Occupational Safety and Health evaluated the building's air quality and ventilation system. The evaluation found a "multitude of building problems and chemical and fume exposures," including the fact that the ventilation system was not operating properly. However, the amount of chemicals present at time of measurement was within the permitted regulatory levels.

Lindhag continued to experience symptoms after leaving her employment. She also became sensitive to ordinary chemicals, like hair spray, perfume, and car fumes. In November 1988 she was diagnosed for the first time with asthma. In February 1989 Dr. Stewart, an Anchorage pulmonologist, diagnosed "Asthmatic bronchitis with 'sick building' exposure as a possible inciting event." Dr. Stewart examined Lindhag's blood and found low eosinophil[1] levels, which suggested that Lindhag's suffering did not come from an allergic reaction or a parasitic infection. Dr. Baker, a Seattle allergist, examined Lindhag in January 1990. He attributed Lindhag's problems to "sick building syndrome" and also suggested (without formally diagnosing) that Lindhag might suffer from Multiple Chemical Sensitivity Syndrome (MCSS). In January 1991 Dr. Wong–Ngan performed a psychological evaluation of Lindhag and found that she was not malingering and that her symptoms were consistent with other chemical sensitivity patients.

In May 1997 an employer-sponsored independent medical evaluation (EIME) was per-

---

1. An eosinophil is "a leukocyte [white blood cell] or other granulocyte with cytoplasmic inclusions readily stained by eosin." WEBSTER'S THIRD NEW INT'L DICTIONARY 760 (1993). It has "distinctive antiparasitic functions." STEDMAN'S MEDICAL DICTIONARY 860 (25th ed. 1990).

formed by Dr. Arora. Dr. Arora concluded that Lindhag did not have a cognitive disorder and that her respiratory problems were not work-related. Accordingly, in July 1997 the employer controverted Lindhag's entitlement to benefits.

The Alaska Workers' Compensation Board appointed Dr. Allene Scott to perform a second independent medical evaluation (SIME). Dr. Scott obtained assistance from at least six specialists in conducting her evaluation. In June 1998 Dr. Scott concluded that Lindhag had a number of medical conditions, but that no condition could be linked, within a reasonable degree of medical certainty, to her toxic exposures during employment. For example, she concluded that the likely primary contributing factor behind Lindhag's sinusitis and rhinitis was her allergy to common household dust mites. (Lindhag tested positive for this allergy in an intradermal allergy test performed by Dr. Scott.) She concluded that Lindhag had suffered from asthma prior to the office move. She also found no evidence of sick building syndrome, and found that any diagnosis of MCSS would have been inappropriate, in part because Lindhag had suffered similar symptoms prior to the exposure.[2] Finally, Dr. Scott expressed uncertainty on Lindhag's neurological symptoms and recommended a PET scan and further diagnostic testing.

Dr. Wu completed the PET scan and found the results consistent with encephalopathy associated with toxic exposure.[3] Another doctor concurred. Accordingly, in October 1999 Dr. Scott amended her opinion and found that Lindhag's exposure to chemicals while working for DNR had caused "toxic encephalopathy." Her opinions about the non-encephalopathic symptoms remained unchanged.

Lindhag had Dr. Scott's initial report reviewed by another expert, Dr. Heuser, in April 1999. After reviewing medical records, Dr. Heuser concluded that (1) toxic encephalopathy was present; (2) workplace exposures significantly aggravated conditions like bronchitis and asthma; and (3) exposures caused significant chemical injury, including sick building syndrome and eventually MCSS.

## B. Proceedings

Based on Dr. Scott's opinions, the state agreed to pay benefits for Lindhag's encephalopathic symptoms. However, the issue of benefits for non-encephalopathic symptoms went before the board. The employer relied on evidence from the SIME physician, Dr. Scott. Lindhag relied on testimony by her treating physician, Dr. Steiner, and toxicology consultant, Dr. Heuser.

The board issued its order on May 8, 2000, denying Lindhag's claim for non-encephalopathic-related benefits. It reached this conclusion after utilizing the three-part analysis for determining whether an employee's claim is compensable:[4] It first found that Lindhag established a preliminary link that the exposures substantially caused her medical conditions, which created the presumption of compensability. It then found that the state successfully rebutted this presumption by presenting substantial evidence that the disability was not work-related. Finally, it concluded that Lindhag failed to prove her claim by a preponderance of the evidence. The board found that the exposures caused merely a "temporary aggravation" of a pre-existing condition, and the persisting conditions were caused "by non-work-related factors, including dust mites."

The board also commented on its reliance upon the expert witnesses:

In reaching this conclusion, *we rely primarily upon Dr. Scott's experience and expertise as our SIME physician and on the exhaustive nature of her evaluation of the employee, as well as her firm understanding of the voluminous medical records.* Consequently, we will give the most weight to the reports and testimony of our own independent expert when assessing

2. In reaching this conclusion, Dr. Scott relied on a commonly used definition of MCSS, which states that the diagnosis is only proper when the symptoms did not exist prior to the documented exposure.

3. Encephalopathy is "any disease of the brain." Stedman's Medical Dictionary 508 (25th ed.1990).

4. *See infra* n. 12 and accompanying text.

the preponderance of the evidence. In sum, we find our second independent medical evaluator's opinions the preponderance of the evidence and make our findings and conclusions accordingly.

First, we recognize Dr. Scott based her conclusions about the nature and likely causes of the employee's conditions upon a reasonable degree of medical certainty. She acknowledged her review of approximately 800 pages of medical records regarding the employee's conditions. Moreover, her report makes specific reference to those medical records where appropriate. *Thus, we find it is clear that Dr. Scott's opinions incorporated both a comprehensive and a current understanding of the employee's relevant medical history.* We find her opinions are fully supported by the other unbiased experts, and are preponderant evidence supporting findings that the employee's only current work-related condition is encephalopathy.

Based on our review of the record, we find Dr. Scott had a *clearer and more complete picture of the employee's medical history than Dr. Heuser or even Dr. Steiner.*

(Emphases added.) Along these lines, the board also noted factual inaccuracies in Dr. Heuser's report and evidence that Dr. Steiner lacked a firm grasp on the case history and had "no formal training in environmental medicine and occupational illness."

Lindhag appealed the board's decision to the superior court, but then filed a motion for stay of appeal in order to first petition the board for modification. The superior court granted the stay, and a petition for rehearing and modification followed. Pursuant to AS 23.30.130(a) and 8 Alaska Administrative Code 45.150(d), Lindhag alleged mistake of fact and change in conditions to warrant a rehearing. Her petition was primarily based on newly discovered evidence regarding her lack of allergic reaction to dust mites. The board denied the motion on September 3, 2002, finding that Lindhag made no showing of due diligence and was impermissibly attempting to retry her claim.

Lindhag next filed a petition for reconsideration, which was denied. Lindhag then appealed to the superior court, which consolidated review of the order denying benefits with the order denying a rehearing. The superior court affirmed both orders. Lindhag appeals.

## III. STANDARD OF REVIEW

"When the superior court acts as an intermediate court of appeals, we independently review the merits of the administrative determination."[5] We review the determinations of fact by an administrative agency under the "substantial evidence" standard.[6] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7] "On review we will not reweigh conflicting evidence, determine witness credibility, or evaluate competing inferences from testimony because those functions are reserved to the Board."[8] Thus, "even when conflicting evidence exists, we uphold the Board's decision if substantial evidence supports it."[9]

Review of an agency's application of its own regulation to the facts is limited to whether the agency's decision was arbitrary, unreasonable, or an abuse of discretion.[10]

## IV. DISCUSSION

The Alaska Workers' Compensation Act creates a presumption that an employee's claims are compensable. Applying this presumption involves a three-step analysis:[11]

First, the employee must establish a preliminary link between the injury and

---

5. *Bradbury v. Chugach Elec. Assoc.*, 71 P.3d 901, 905 (Alaska 2003).

6. *Id.*

7. *Id.*

8. *Robinson v. Municipality of Anchorage*, 69 P.3d 489, 493 (Alaska 2003).

9. *Bradbury*, 71 P.3d at 905.

10. *Hodges v. Alaska Constructors, Inc.*, 957 P.2d 957, 960 (Alaska 1998).

11. *Bradbury*, 71 P.3d at 905; AS 23.30.120(a).

the employment. This step of the analysis requires consideration of "only evidence that tends to establish the link." ... In the second step, we inquire whether the employer rebutted the evidence with "substantial evidence that either (1) provides an alternate explanation which, if accepted, would exclude work related factors as a substantial cause of the [injury]; or (2) directly eliminates any reasonable possibility that employment was a factor in causing the disability." ...

As a third step, once the employer has rebutted the presumption that the injuries are work related, the employee can prevail only if he proves his claim by a preponderance of the evidence.[12]

"To prove a claim by a preponderance of the evidence, the employee must induce a belief in the trier of fact that the asserted facts are probably true." [13] As discussed above,[14] the board applied this test and concluded that, under the third step, Lindhag failed to prove her claim by a preponderance of the evidence. It relied on SIME Dr. Scott's expert opinion and concluded that Lindhag's work was not a substantial cause of her non-encephalopathic conditions; rather, the conditions were deemed a product of "non-work-related factors" and were only temporarily aggravated during her employment.

## A. The Board's Findings Were Supported by Substantial Evidence.

Lindhag contends that we should reverse the board's findings for two reasons. First, Lindhag claims that the board's written findings were insufficiently detailed to support its conclusions. Second, she argues that substantial evidence did not support the board's finding that her "non-encephalopathy related problems were caused by non-work related factors, including dustmites" because the

board failed to review the "whole record." Specifically, Lindhag complains that the board failed to adequately consider three facts: (1) post-employment asthma diagnosis; (2) eosinophil and antibody testing; and (3) post-hearing dust mite evidence.

### 1. The board's written findings are sufficiently detailed to support its conclusions.

Lindhag claims that the board's written findings do not provide adequate detail to support its conclusions. We disagree.

An administrative agency must make findings of fact and conclusions of law regarding all issues that are both "material" and "contested." [15] If these findings or conclusions are insufficient to permit intelligent appellate review, we will remand the case to the agency for further deliberation.[16] Findings are adequate to permit appellate review when "at a minimum, they show that the Board considered each issue of significance, demonstrate the basis for the Board's decision, and are sufficiently detailed." [17]

Lindhag's argument that the board made insufficient factual findings is unconvincing. The board's order first recites the factual history of the case at length, including some of the facts that Lindhag alleges were not adequately considered—e.g., that an asthma diagnosis "had not specifically been made before" the employment, and that Dr. Stewart's blood testing "revealed few eosinophils present." Next, the board in its conclusions of law applied the three-part presumption analysis, as described above, in reaching its conclusion that Lindhag did not prove her claim by a preponderance of the evidence.

In deciding whether Lindhag met her burden of proof, "the disputed issues hinged solely on the opinions of medical experts who

12. *Robinson,* 69 P.3d at 494 (quoting *Temple v. Denali Princess Lodge,* 21 P.3d 813, 816 (Alaska 2001) (citations omitted)).

13. *Bradbury,* 71 P.3d at 906.

14. *See supra* Part II.B.

15. *Bolieu v. Our Lady of Compassion Care Ctr.,* 983 P.2d 1270, 1275 (Alaska 1999) ("The Board need only make findings with respect to issues that are both material and contested.... When

the Board fails to make a necessary finding, we cannot fill the gap by making our own determination from the record; we must remand to the Board.") (citations omitted).

16. *Stephens v. ITT/Felec Servs.,* 915 P.2d 620, 627 (Alaska 1996).

17. *Id.* at 629 (Matthews, J., dissenting in part).

evaluated Ms. Lindhag and her medical history." Thus, the board was required to weigh the testimony of Dr. Scott against the testimony of Drs. Steiner and Heuser. The board explicitly accepted Dr. Scott's testimony over Lindhag's witnesses, finding that Dr. Scott had a "clearer and more complete picture" of Lindhag's medical history, and that Dr. Steiner lacked training in "environmental medicine and occupational illnesses" and Dr. Heuser's report contained factual inaccuracies.[18]

 This explanation is sufficient to support the board's decision to favor one witness's testimony over another's. Under the "substantial evidence" standard of review, we will not choose between conflicting medical testimony if the decision below is supported by substantial evidence.[19] Additionally, the Workers' Compensation Act grants the board the "sole power" to determine witness credibility: "A finding by the board concerning the weight to be accorded a witness's testimony, including medical testimony and reports, is conclusive even if the evidence is conflicting or susceptible to contrary conclusions."[20] The board concluded that Dr. Scott's testimony provided substantial evidence on which to base its decision, and we agree: Dr. Scott was the most qualified expert at trial, she was appointed by the board to perform an independent medical examination, she enlisted the assistance of several experts in reaching her conclusions, and her medical opinions were thorough and internally consistent. Because the record reflects that Dr. Scott's testimony constituted substantial evidence, we conclude that the board did not err in placing its reliance upon Dr. Scott's testimony, and that the written order justifying the board's decision was not deficient.

### 2. The board's failure to expressly discuss certain medical evidence does not justify reversal.

Lindhag specifically complains that three factual points were not adequately considered by the board. These points come from Lindhag's medical testimony and support her theory of the case. Because the board explicitly relied on Dr. Scott's testimony, it is not fatal that the board failed to exhaustively describe and then dismiss each opinion of Lindhag's medical experts—the conclusions of those experts were rejected *in toto*. The board's finding that Dr. Scott's testimony was the most credible supports its conclusion that substantial evidence favored the employer and that Lindhag failed to carry her burden. As an examination of the three factual points raised by Lindhag shows, whatever support the three points might have lent to her case, Dr. Scott's testimony provided at least equally plausible alternative explanations on each point.

First, Lindhag argues that "she was never diagnosed with asthma until after her exposure to toxins while employed by DNR in 1988" and that the "Board's decision reflects no deliberation on this matter." But the board noted its awareness of this fact, and Lindhag's argument runs afoul of the *post hoc ergo propter hoc* logical fallacy: just because the asthma diagnosis came *after* the exposure does not mean that the exposure *caused* the asthma. Indeed, the board accepted Dr. Scott's findings that the exposure did not cause the asthma. Dr. Scott concluded:

> Therefore, it is my opinion, within a reasonable degree of medical certainty that Ms. Lindhag experienced some aggravation of her hyper-reactive airway problems. It is common for individuals with asthma and allergic rhinitis to be particularly susceptible to a variety of irritants ... expected to be present in a new office building. However, *since the patient clearly had the upper airway problems as well as reactive airway disease (asthma) prior to moving into the building, I do not think that any persistent asthma symptoms can be reasonably related to that exposure.*

---

18. The thorough discussion by the board in adopting Dr. Scott's testimony is reproduced *supra* Part II.B.

19. *Bradbury,* 71 P.3d at 905.

20. AS 23.30.122.

(Emphasis added.) The board did not err in following this conclusion.

Second, Lindhag points to evidence regarding eosinophil and antibody testing. If eosinophil levels in the blood are abnormally high (eosinophilis), an individual may be suffering from allergic or parasitic disorders. Lindhag's blood test revealed low eosinophil levels. In the words of Dr. Steiner, "I don't want to call it a lousy test. It's not a very specific test. So the absence of eosinophils doesn't tell me it's not asthma, but it may suggest that it's not due to an allergic basis." While Lindhag's eosinophil testing suggested that her symptoms may have lacked an allergic basis, Lindhag's intradermal allergy testing with Dr. Scott revealed an allergic reaction to dust mites. This testing, along with other factors, led Dr. Scott to conclude that Lindhag's sinusitis was likely caused by common household allergens, including dust mites, and that her asthma existed prior to her exposures with DNR. Thus, we cannot conclude that the board erred in favoring Dr. Scott's allergy testing over the inconclusive eosinophil test results.

With respect to antibody testing, Lindhag points to preliminary testing which showed positive IgG antibodies to Trimellitic Anhydride (TMA), an industrial chemical found in items such as carpet adhesive that can possibly cause respiratory disease and asthma. However, Dr. Scott and one of her specialists, Dr. Fireman, opined that the presence of IgG antibodies indicated exposure to TMA, but not necessarily any adverse reaction to it. According to their opinion, the relevant antibody to determine hyper-sensitization, or adverse reaction, is IgE—and the preliminary tests showed that Lindhag's IgE levels were normal. In addition, the testimony suggested that the completed antibody testing was inadequate—Dr. Scott described it as not being clinically interpretable. Dr. Scott went on to testify that more testing along these lines would not have changed her opinion, and that there was no clinical justification to perform more testing. In Dr. Scott's words, "All the IgE antibody testing, if, in fact, it was confirmed, would indicate [is] that at some time she had been exposed to it." In any case, Lindhag's physicians had requested more conclusive testing, but it remained uncompleted because the serum specimen was no longer available. Lindhag bears the burden of proving her claim, and the lack of more conclusive antibody evidence is her own failure of proof. The board did not err in following Dr. Scott's opinions.[21]

■ Third and finally, Lindhag points to the evidence obtained after the hearing that allegedly disproved the board's finding that a dust mite allergy may have contributed to her symptoms.[22] Whatever the merits of this "newly discovered evidence," it plays no role in the question of whether the board's decision was supported by substantial evidence. The board cannot be expected to deliberate on evidence that was not presented at the hearing. For these reasons, we affirm the board's denial of benefits for non-encephalopathic conditions.

## B. The Board Did Not Abuse Its Discretion in Denying Lindhag's Petition for Modification.

■ Lindhag also contends that the board abused its discretion in denying her petition for rehearing and modification. Alaska Statute 23.30.130(a) permits the board to rehear and modify a compensation case "[u]pon its own initiative, or upon the application of any party ... on the ground of a change in conditions ... or because of a mistake in its determination of a fact." The board exercises its discretion in deciding whether to grant a rehearing.[23] Lindhag alleges both a mistake in fact and a change in conditions based upon new medical information. We disagree.

---

**21.** While the board's first decision did not discuss the antibody testing, its reliance on Dr. Scott's opinions regarding this testing was made explicit in its order denying Lindhag's petition for rehearing. Lindhag had also argued in that petition that the court made a mistake of fact in not considering the antibody evidence.

**22.** For more discussion of this "newly discovered evidence," see infra Part IV.B.

**23.** 8 AAC 45.150(a).

The board agreed with Dr. Scott that a dust mite allergy could be a contributing factor for her sinusitis and rhinitis conditions. As mentioned above, Dr. Scott's intradermal allergy testing of Lindhag indicated an allergic reaction to dust mites (D pteronyssinus), which led Dr. Scott to conclude that dust mites were "likely . . . the primary contributing factor to her sinus inflammation and rhinitis." Because Dr. Scott deemed the sinusitis and rhinitis to be chronic and pre-existing, she concluded that exposure during employment may have temporarily aggravated these conditions, but that "[n]one of her sinus/rhinitis problems since June 14, 1990, within a reasonable degree of medical certainty, are related to the time she worked in the new DNR building." Dr. Scott did not link the suspected dust mite allergy to any of the other conditions suffered by Lindhag, such as asthma.

Shortly after the issuance of the board's order, Lindhag had experts perform a blood test and analyze her home. Lindhag claims that this evidence "was a product of her continuing treatment" with her doctors. The blood test revealed that the levels of certain antibodies in Lindhag's blood were too insignificant to support a claim of asthma caused by dust mite allergy. In addition, Dr. J. Timothy Foote found "no detectable dust mite allergen in the sample" from Lindhag's bed. Dr. Steiner accordingly reasoned that "[c]laims of asthma due to dust mite allergies are refuted by this test." This new evidence, if correct, would directly contradict Dr. Scott's conclusion that the dust mite allergy may have been a contributing factor to Lindhag's chronic sinusitis and rhinitis, which was accepted and relied upon by the board.

### 1. Mistake of fact/due diligence

Lindhag first argues that the newly discovered dust mite evidence results in a mistake of fact in the original decision. The governing administrative regulation elaborates:

> A petition for a rehearing or modification based on an alleged mistake of fact by the board must set out specifically and in detail
>
> (1) the facts upon which the original award was based;
>
> (2) the facts alleged to be erroneous, the evidence in support of the allegations of mistake, and, *if a party has newly discovered evidence, an affidavit from the party or the party's representative stating the reason why, with due diligence, the newly discovered evidence supporting the allegation could not have been discovered and produced at the time of the hearing;* and
>
> (3) the effect that a finding of the alleged mistake would have upon the existing board order or award.[24]

The key language in this regulation is the requirement that new evidence could not have been discoverable prior to the hearing through due diligence. This requirement is nearly identical to a requirement that we adopted for motions for a new trial and motions for relief from judgment based on newly discovered evidence.[25] This requirement is fair because an allegation of mistake "should not serve as 'a back-door route to retrying a case because one party thinks he can make a better showing on a second attempt.'"[26] Our review of an agency's application of its own regulation is limited to whether the decision was "arbitrary, unreasonable, or an abuse of discretion."[27]

The affidavit by Lindhag's attorney attempted to make out an argument for due diligence. It claimed that such dust mite testing "prior to the hearing, was never considered by myself or Ms. Lindhag." It noted that the report could not have been produced

---

**24.** 8 AAC 45.150(d) (emphasis added).

**25.** *See* Alaska Civil Rule 59(d); Alaska Civil Rule 60(b)(2). In *Sengupta v. Univ. of Alaska,* 21 P.3d 1240, 1261 (Alaska 2001), we observed that "motions based on newly discovered evidence" are reviewed under a five-part standard. *Id.* The third part of this standard mandates that "the newly discovered evidence must . . . not have

been discoverable, with due diligence, before trial." *Id.*

**26.** *Hodges v. Alaska Constructors, Inc.,* 957 P.2d 957, 961 (Alaska 1998) (quoting *Interior Paint Co. v. Rodgers,* 522 P.2d 164, 169 (Alaska 1974) (internal quotation omitted)).

**27.** *Id.* at 960.

at the time of hearing "because there·was no such report to produce"—in other words, because the evidence did not yet exist. It went on to suggest that the testing was ultimately performed "as a result of the normal interaction between the employee and her doctor," and not merely in reaction to the reasoning of the board in its order.

The board found this affidavit unpersuasive because it failed to establish any reason why this evidence "could not" have existed at the time of hearing, as required by due diligence. Lindhag was on notice of Dr. Scott's opinion regarding her dust mite allergy as early as June 1998—almost two years before the hearing. Dr. Scott reaffirmed her opinion in October 1999. At the hearing, Lindhag's attorneys attacked Dr. Scott's conclusion regarding dust mites. Lindhag's briefing speculated that the dust mite "is quite possibly not found in Alaska," and Lindhag put forth contrary medical testimony finding that Lindhag does not suffer from an allergic reaction to dust mites. As described above, the board rejected Lindhag's testimony in favor of Dr. Scott's testimony.[28] Despite her two-year notice that the primary medical expert and SIME physician, Dr. Scott, relied on a positive test result for dust mite allergy in reaching her unfavorable conclusion, Lindhag failed to obtain more conclusive testing until immediately following the adverse board decision.

 The board found that the absence of these test results prior to its decision "can only be considered a tactical choice" by Lindhag and her counsel. Accordingly, it found that Lindhag impermissibly sought to retry her claim and rejected her petition. It found that the affidavit established only that the new evidence "was not" developed prior to the hearing, not that it "could not" have been developed, which is· what due diligence requires. Given that Lindhag offered no reason why the evidence could not have been obtained, that she had two years' notice to seek rebuttal evidence, and that she did attack Dr. Scott's opinion on this point at the hearing—albeit in a less-effective manner— we conclude that the board did not abuse its discretion in finding that this post-hearing evidence was not presented with due diligence.

## 2. Change in conditions

 Lindhag argues in the alternative that the new medical testimony presents a change in conditions. To obtain a rehearing on these grounds, a petition must set out in detail the history of the claim and the nature of the changed conditions; a "bare allegation of change of conditions ... without specification of details sufficient to permit the board to identify the facts challenged will not support a request for a rehearing or modification."[29]

 While Lindhag asserts a change in conditions, the bulk of her argument focuses on a mistake in fact, as discussed above. Her treatment of change in conditions fails to go beyond a "bare allegation." Moreover, it is not clear that any condition in this case has actually "changed."[30] Her physical and economic conditions, in fact, have remained unchanged; it is the medical knowledge regarding the cause or source of those conditions that may have changed. We conclude that this is not the kind of change envisioned by the workers' compensation statute governing modifications.

Black's Law Dictionary defines "change in conditions" for workers' compensation actions as: "substantial worsening of an employee's physical health occurring after an award, as a result of which the employee merits an increase in benefits."[31] A number of states have strictly confined the meaning of change in conditions in this realm to a change in physical condition.[32] Other states have been more expansive: They have also

**28.** *See supra* Part IV.A.1.

**29.** 8 AAC 45.150(c) & (e).

**30.** *See Fischback & Moore of Alaska, Inc. v. Lynn,* 453 P.2d 478, 485 (Alaska 1969) ("Change in condition necessarily implies a change from something previously existing. In this context, it

must refer to a change from the condition at the time of the award which is being modified.") (citation omitted).

**31.** BLACK'S LAW DICTIONARY 247 (8th ed.1999).

**32.** *See* 8 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 131.03[1][e] (2005).

found change in conditions where an "economic change" has adversely affected a claimant's ability "to get or hold employment, or to maintain his earlier earning level."[33] We have not ruled on this question,[34] and we need not today—Lindhag's dust mite evidence presents neither a "physical" nor an "economic" change. Rather than properly alleging a change in condition, Lindhag merely alleges a different cause or source for the same unchanging condition. Such an allegation is insufficient under the board's regulation governing modifications.

■ Moreover, an alleged change in conditions cannot be used to retry original issues.[35] Upon reopening a claim due to change in conditions, "the issue before the Board is sharply restricted to the question of extent of improvement or worsening of the injury on which the original award was based."[36] In other words, "neither party can raise original issues such as *work-connection*, employee or employer status, occurrence of a compensable accident, and degree of disability at the time of the first award."[37] Here, Lindhag is introducing new evidence for proof of causation, to support the notion that her injury is work-related. This is an "original issue" not contemplated by change-in-conditions modification. Thus, the board did not abuse its discretion in denying Lindhag's request for modification on these grounds.

### 3. Due process

Finally, Lindhag makes a cursory argument that denial of her petition for rehearing deprived her of her due process rights.[38] Because we will not consider an issue "given only a cursory statement in the argument portion of a brief,"[39] we decline to consider whether Lindhag's due process rights were violated.

## V. CONCLUSION

Because the board's denial of benefits to Lindhag for non-encephalopathic conditions was supported by substantial evidence, and because the board did not err in rejecting Lindhag's petition for modification, which presented new evidence without due diligence and which failed to offer any evidence of a change in her condition, we AFFIRM the superior court decision upholding both orders by the board.

---

These states include Arizona, Colorado, Illinois, Kentucky, Oregon, South Dakota, and Washington. *Id.* at n. 26.

33. *Id.*

34. We note, however, that change in conditions under the terms of Alaska's modification statute, AS 23.30.130(a), at least includes the non-physical "change in residence."

35. LARSON, *supra* n. 32, at § 131.03[2][a]. *Cf. Hodges v. Alaska Constructors, Inc.*, 957 P.2d 957, 961 (Alaska 1998) ("allegation of mistake should not serve as 'a back-door route to retrying a case because one party thinks he can make a better showing on a second attempt.' ") (quoting *Interior Paint Co. v. Rodgers*, 522 P.2d 164, 169 (Alaska 1974) (internal quotation omitted)).

36. LARSON, *supra* n. 32, at § 131.03[2][a].

37. *Id.* (emphasis added).

38. Lindhag argues that the board's refusal to grant her a rehearing deprived her of workers' compensation benefits without due process. Her argument misconstrues the scope of a possible violation: whether the board's consideration of her petition violated due process. The board had discretion to accept or deny her petition for rehearing based on the criteria identified in 8 AAC 45.150. Lindhag has not presented any argument regarding how the exercise of that discretion within the bounds set by 8 AAC 45.150 might violate due process. She has not, therefore, sufficiently addressed this issue.

39. *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991).