NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MICHELE A. BUCHINSKY, | ) | |
| | ) | Supreme Court No. S-15547 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 12-027 |
| | ) | |
| THE ARC OF ANCHORAGE & | ) | MEMORANDUM OPINION |
| SEABRIGHT INSURANCE CO., | ) | AND JUDGMENT* |
| | ) | |
| Appellees. | ) | No. 1585 – May 25, 2016 |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Michele A. Buchinsky, pro se, Sedona, Arizona, Appellant. Richard L. Wagg, Russell, Wagg Gabbert & Budzinski, Anchorage, for Appellees.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

## I. INTRODUCTION

A worker injured her knee and shoulder areas after the same filing cabinet fell on her twice in the course of a week. Her employer controverted all benefits after its doctor said the work-related injury was not the substantial cause of the employee's later need for medical treatment. The Alaska Workers' Compensation Board denied the employee's claim for additional benefits because it determined she had not shown the

---

\*      Entered under Alaska Appellate Rule 214.

work-related injuries were the substantial cause of her disability or need for medical treatment. The Alaska Workers' Compensation Appeals Commission affirmed the Board's decision. We now affirm the Commission's decision.

## II.    FACTS AND PROCEEDINGS

Michele Buchinsky worked for the Arc of Anchorage beginning in May 2007, principally as a case manager. She maintained confidential client files locked in a filing cabinet in her office. According to Buchinsky, the lock on the filing cabinet was not fully operational when she started to work for the Arc, and the lock's functioning grew progressively worse. When she notified her supervisors about this problem, they provided a substitute filing cabinet with two or three drawers.[1] According to Buchinsky the substitute filing cabinet was not affixed to the wall, as the original filing cabinet had been. Buchinsky testified that she warned a supervisor the filing cabinet would be overloaded if she transferred all the files to the cabinet, but the supervisor simply told her to use it anyway.

On December 20, 2007, Buchinsky tried to retrieve a file from the top drawer of the filing cabinet. The filing cabinet drawers slid open, and the entire filing cabinet fell forward onto her knees, knocking her off her chair. She treated her knees with ice that day at work, took some over-the-counter pain medication, and saw her chiropractor, Dr. Gregory Culbert, the following week. She said she told her supervisor about the injury, filled out any required paperwork, and attended a meeting with ice packs on her knees.

On December 26 the filing cabinet again fell on her. This time, according to Buchinsky, she tried to take protective action to prevent further injury to her knees by

---

[1]    Buchinsky could not recall if the filing cabinet had two or three drawers, but she knew it did not have four drawers and was not a lateral filing cabinet.

putting her hand out to stop the filing cabinet from falling forward, causing injury to her neck and her left arm and shoulder. She said that she again completed paperwork about the incident and gave it to her supervisor. She saw Dr. Culbert the next day, December 27, for both work-related injuries; he released her to work as of December 31 with no restrictions.

Buchinsky was fired on January 4, 2008; she said she was given 20 minutes to clear her personal belongings out of the office and did not know why she was fired. According to Buchinsky she had received positive employee evaluations and had even received an employee award, but she also indicated she was concerned she might be fired after the second injury.

Buchinsky sought treatment from the emergency room for her right knee on January 24, 2008.[2] She reported to the emergency room doctor that she had injured her knee at work, that it appeared to heal, but that she had again begun to experience pain the day before. She could not recall any specific incident from the day before that could have caused the increased knee pain, "although she sa[id] she [might] have twisted it slightly." The emergency room doctor's notes indicate that he "placed [her] on crutches" with instructions not to use the right knee. X-rays taken at the emergency room showed "moderate degenerative joint disease" in her knee; the x-rays also "show[ed] [the] suggestion of nondisplaced tibial plateau fracture."

After the emergency room visit Buchinsky consulted with Dr. Jeffrey Moore; he thought she had "[e]arly degenerative changes" to both knees but wanted to "obtain the previous MRI scans." Those scans, from February 2006, reflected a

---

[2]     At her deposition Buchinsky testified that Dr. Culbert referred her to the emergency room, but the medical records do not reflect this. Buchinsky's medical records show a gap in treatment between December 27, 2007 and January 24, 2008, and she could not remember with certainty if she saw Dr. Culbert in January 2008.

diagnosis of "[m]ulticompartmental osteoarthritis" in her left knee and "[m]oderately advanced multicompartmental degenerative changes" in her right knee; the right knee had additional problems. Dr. Moore's record does not clearly state that Buchinsky needed to continue using crutches. She nonetheless continued to use them, and she thought the change in her gait related to the right knee pain and crutches brought on problems with her lower back, left knee, hips, upper back, and neck.

Buchinsky saw Dr. Moore again about three weeks later for left knee pain. Dr. Moore gave her an injection to treat her knee and released her to work with limitations for three weeks. Buchinsky also consulted with Dr. Culbert, who began a course of regular treatment for back and neck pain. Dr. Culbert diagnosed strains to both the lumbar and cervical regions due to "altered gait" and the use of crutches because of the knee injury.

In May Dr. Moore discussed treatment options with Buchinsky, warning her that arthroscopic surgery would not cure the arthritis in her knees and that she might require a full knee replacement at some later time. Dr. Moore restricted Buchinsky to desk and administrative work at that time.

Shortly after seeing Dr. Moore in May, Buchinsky consulted with a different orthopedic physician, Dr. Gary Benedetti. Dr. Benedetti diagnosed degenerative meniscus tears with osteoarthritis. After reviewing MRI studies Dr. Benedetti told Buchinsky he did not recommend arthroscopic surgery because her chief problem was arthritis so the surgery would not help her. He recommended that she take anti-inflammatory medication, and, like Dr. Moore, he explained that at some point in the future she might need a total knee replacement. He noted that Buchinsky did "not seem happy with this discussion."

Dr. Culbert referred Buchinsky to Dr. Larry Levine in May 2008 for evaluation of her neck and lumbar spine; Dr. Culbert said Buchinsky had "plateaued with

chiropractic care." Because of the level of Buchinsky's pain complaints Dr. Levine administered a screening tool for "psychosocial factors that could complicate a patient's medical condition or lead to delayed recovery." The screening tool revealed some pain-focused attitudes, but Dr. Levine thought it was "worthwhile taking her complaints currently at face value" and, after conducting more tests, including an MRI of her cervical spine, he referred her to Dr. James Eule for "possible surgical decompression of the cervical spine." Dr. Eule recommended surgery to fuse and decompress several levels of Buchinsky's cervical spine, saying she had "a very difficult and complex problem."

Buchinsky filed a written claim for a number of workers' compensation benefits in April 2008. In early May the Arc filed a controversion of all benefits except medical costs based primarily on Dr. Moore's work release. It also arranged for an employer's independent medical evaluation with Dr. John Ballard.

Dr. Ballard reviewed medical records and examined Buchinsky. He diagnosed multiple problems, including arthritis in her knees, degenerative disc disease in her neck, "[g]eneralized musculoskeletal deconditioning," and "[b]ilateral knee contusions, secondary to work-related injuries of December 2007." With the exception of the contusions, which he said had healed, Dr. Ballard did not think the work-related accident was the substantial cause of any of Buchinsky's medical problems. He noted that the arthritis in her knees was "a long term degenerative condition" and that she had "a longstanding history" of knee problems. He tied her low back complaints to previous back problems.[3] With regard to her neck symptoms, he noted that shortly after the

_____

[3]     Buchinsky had surgery on her low back in 1977 and 1981. She consulted with a neurosurgeon about a month before the work accident for her neck and for "weakness and paresthesias intermittently in the left leg." At that time she thought her
(continued...)

injury, both when she went to the emergency room and when she treated with Dr. Culbert, there was no indication she had any complaints related to her neck. Although Dr. Ballard thought Buchinsky was disabled by her neck condition and her "severe musculoskeletal deconditioning," he gave the opinion that her work-related injury was not the substantial cause of the disability.

The Arc controverted all benefits after Dr. Ballard submitted his report. In July Dr. Levine declined to give a written opinion about the relationship between Buchinsky's work injury and her need for continued medical treatment, deferring instead to Dr. Moore and Dr. Culbert. On the same day Dr. Eule concluded there was a work connection to her neck complaints because Buchinsky had "never experienced any problems previously and never received any treatment for any neck problem in the past." Dr. Eule wrote, "If there are no other records that would suggest that this [neck condition] is a prior injury th[e]n she would receive a permanent impairment rating from this . . . ."

Buchinsky was scheduled for neck surgery in July 2008, but preoperative testing suggested she had diabetes and high blood pressure. Dr. Eule later wrote the surgery was canceled because Buchinsky "had uncontrolled hypertension with uncontrolled diabetes." Dr. Eule observed that she "failed to follow through and have anything done" and "continues to do worse and worse." Dr. Levine also told Buchinsky that her most pressing health problems were her hypertension and diabetes; he reiterated that he thought she was "capable of working as a case manager at a sedentary level."

In May 2010 the Arc asked another doctor, Dr. William Jackson, to review Buchinsky's imaging studies from before and after the work accidents. Dr. Jackson

---

[3]     (...continued)
symptoms were "likely associated with one or both major motor vehicle accidents she has been involved in recently."

summarized the findings of two MRIs of Buchinsky's cervical spine, one from September 2007 and one from May 2008, and stated that the findings of the second MRI "are identical to those which were noted" on the earlier one and "[t]here has been no interval traumatic change." With respect to her knees, Dr. Jackson reviewed MRIs from February 2006 and May 2008 and also looked at x-rays from May 2007. He concluded there had "been no interim traumatic change" to the knees and noted that the later MRI showed "mild progression of the degenerative arthritis previously described."

The Board ordered a second independent medical evaluation with Dr. Edward Tapper. He reviewed extensive medical records beginning from February 2006, almost two years before the work-related accident. Those records showed that Buchinsky was in a car accident in 2005, where she experienced "multi-trauma." In addition MRIs from 2006 showed significant osteoarthritis in both knees; an MRI of her neck from September 2007 showed "multilevel spinal and neural foraminal stenosis." In addition to the imaging studies, Buchinsky's medical records contained several pain diagrams and questionnaires reporting pain or numbness (variously) in her back, left arm and shoulder, left leg, both knees, and neck. In one November 2007 record, about a month before the alleged neck injury, her chief complaint was neck pain that radiated down her arm. That record indicated that in November 2007 Dr. Erik Kohler discussed with Buchinsky possible surgical decompression of her cervical spine, but Buchinsky said she could not have surgery then because she was a single parent and was "unable to have down time."

In addition to reviewing Buchinsky's medical records, Dr. Tapper examined her; he described her as "present[ing] in an alarming manner." His physical examination was limited because of "her incapacity and generalized emotional and pain decompensation"; he described the examination difficulties in his report. Buchinsky reported to Dr. Tapper that "her knees were 'great' prior to the events of December

2007." She also denied having trouble with her neck before December 2007. Dr. Tapper, like Dr. Ballard, concluded that Buchinsky's neck and knee problems were caused by her preexisting arthritis and degenerative joint disease. Dr. Tapper suggested that Buchinsky's work-related injuries "may be a substantial cause of her psychiatric decompensation," but evidently felt an opinion about that issue was beyond his expertise as he decided to "leave that to the appropriate physicians."[4]

The Board held a hearing on Buchinsky's claim, with Buchinsky as the sole witness. By that time Buchinsky was receiving Social Security Disability, but she could not identify her disabling condition.

Buchinsky testified about her work at the Arc, described the accident, and recounted the medical care she received after the injury. According to Buchinsky she was able to complete all her assigned duties for the Arc before she was injured, including teaching CPR, which required her to crawl and be on her knees for periods of time; she also described the praise she received for her work. She acknowledged wearing a knee brace occasionally but denied that her knee pain impaired her work before the filing cabinet fell on her, illustrating the point by testifying that she wore high heels to work. At the time of the hearing, she appeared to be bedridden; she said she was lying in bed as she testified by telephone.

In closing the Arc conceded that Buchinsky had attached the presumption of compensability and argued that it had rebutted that presumption. It then asked the Board to decide that Buchinsky had not proved her claim by a preponderance of the

---

[4] Buchinsky underwent a psychological evaluation with Dr. Michael Rose as part of her application for Social Security Disability. He diagnosed a pain disorder, depressive disorder, and histrionic personality features. He noted that Buchinsky "seem[ed] heavily invested in her symptoms to the point of invalidism" and said she had a "tendency to convert stress to somatic symptoms."

evidence, relying primarily on the opinions of Dr. Tapper and Dr. Ballard but also pointing out inconsistencies between Buchinsky's testimony and the medical records that predated her injury.

The Board agreed with the Arc that Buchinsky had not proved her case by a preponderance of the evidence. The Board gave more weight to the opinions of Dr. Ballard and Dr. Tapper because they both discussed medical records predating the injury that showed Buchinsky had serious neck complaints and had consulted with a doctor about neck surgery in the month before the injury. Both also discussed Buchinsky's preexisting knee problems.

Buchinsky appealed to the Commission, appearing pro se. The Commission affirmed the Board, concluding that substantial evidence in the record supported the Board's decision. It rejected Buchinsky's argument that "her active lifestyle prior to the work incidents . . . establish[ed] that the work incidents caused her current disability and need for medical treatment."

Buchinsky appeals.

## III. STANDARD OF REVIEW

In an appeal from the Alaska Workers' Compensation Appeals Commission, we review the Commission's decision rather than the Board's.[5] We independently review the Commission's legal conclusion that substantial evidence supports the Board's factual findings by "independently review[ing] the record and the Board's factual findings."[6]

---

[5]     *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1178 (Alaska 2014) (citing *Shehata v. Salvation Army*, 225 P.3d 1106, 1113 (Alaska 2010)).

[6]     *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

## IV. DISCUSSION

### The Commission Correctly Concluded That Substantial Evidence Supported The Board's Decision.

Buchinsky asks us to find her claim compensable, reversing the Commission's decision that substantial evidence in the record supported the Board's findings. The Arc conceded at the Board hearing that Buchinsky attached the presumption of compensability, and Buchinsky does not appear to argue that the Arc failed to rebut the presumption. The only issue presented then is whether substantial evidence supported the Board's decision that Buchinsky's work-related injuries were not the substantial cause of her current disability and need for medical treatment.[7]

Substantial evidence supports the Board's finding that Buchinsky's preexisting orthopedic problems rather than her work-related injury were the substantial cause of her disability and need for medical treatment of her knees, back, and neck. At least one doctor compared the MRIs of her neck both before and after the work injury and determined that the MRIs were almost identical. Likewise the imaging studies of her knees showed considerable arthritis before the work injury, and at least one of the doctors Buchinsky consulted told her a few months after the injury that she did not need surgery at that time because her knee problems were due to her arthritis.

---

[7] AS 23.30.010(a) provides that workers' compensation is payable "if, in relation to other causes, the employment is the substantial cause of the disability or . . . need for medical treatment."

Buchinsky appears to raise an argument about credibility, asserting that she was credible. But the Board made no express findings about Buchinsky's credibility in its decision. *Cf. Hoth v. Valley Constr.*, 671 P.2d 871, 874 n.3 (Alaska 1983) ("Absent specific findings by the Board that it chose to disbelieve a witness's testimony, we will not assume that lack of credibility was a relevant factor in the Board's decision.").

Buchinsky argues that her ability to perform all her job duties before the injury and her inability to "perform her job functions to their full capacity" afterward support her argument that she had a compensable injury. But the record here shows that Buchinsky was experiencing quite a number of symptoms in her knees, back, and neck before the work-related injury, despite what she told Dr. Tapper. About a month before the work-related accident, she and a neurosurgeon discussed neck surgery to resolve her complaints related to pain and numbness. And in any event, we have previously rejected arguments that continuing pain following a work-related injury invariably leads to the conclusion that the work-related incident caused the pain, analogizing these arguments to "the *post hoc ergo propter hoc* logical fallacy."[8]

The medical records also show no immediate increase in pain complaints in the period after the injury. Buchinsky's chiropractor released her to work without restrictions by December 31, less than a week after the second incident. Her pain complaints increased about a month later. Although her doctors placed increasing restrictions on her work activities over the next few months, Dr. Levine plainly stated that she should still be able to perform her work as a case manager. Dr. Ballard's and Dr. Tapper's opinions are also relevant evidence supporting the Board's findings. In short ample evidence supports the Board's findings, and the Commission correctly concluded that substantial evidence in the record supported the findings.

The Second Injury Fund provides reimbursement to employers who hire workers with certain potentially disabling conditions after the employer pays more than 104 weeks of compensation.[9] Buchinsky appears to argue that the Arc's failure to notify

---

[8] *Rivera v. Wal-Mart Stores, Inc.*, 247 P.3d 957, 965 n.34 (Alaska 2011) (citing *Lindhag v. State, Dep't of Nat. Res.*, 123 P.3d 948, 954 (Alaska 2005)).

[9] AS 23.30.205(a)-(b).

her that it had filed a notice of a possible claim with the Second Injury Fund merits reversal of the Commission's decision. The Arc gave notice to the Second Injury Fund of a possible claim because Buchinsky had some conditions listed in the related statutory section.[10] The statute requires notice of a possible claim "as soon as practicable."[11] The Arc filed the materials after Buchinsky filed her claim for disability benefits, so presumably it was taking the precaution of filing in the event it lost at hearing and had to pay benefits retroactively. The notice is irrelevant to the question presented in this appeal. Had Buchinsky received time loss, the Arc might have been eligible for some reimbursement from the Second Injury Fund, but this issue is completely unrelated to her eligibility for compensation.

## V.   CONCLUSION

We AFFIRM the Commission's decision.

---

[10]     AS 23.30.205.

[11]     AS 23.30.205(e).