**Paul D. PIETRO, Appellant,**

**v.**

**UNOCAL CORPORATION, Appellee.**

**No. S–13500.**

Supreme Court of Alaska.

June 25, 2010.

---

Michael J. Jensen, Law Office of Michael J. Jensen, Anchorage, for Appellant.

Richard L. Wagg and Vicki A. Paddock, Russell, Wagg, Gabbert & Budzinski, P.C., Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

A worker developed peripheral neuropathy in his feet and was later diagnosed with skin cancer. He asked for workers' compensation benefits for both of these conditions, alleging that they developed as a result of his exposure to arsenic during the course of his work at a fertilizer plant. The Alaska Workers' Compensation Board rejected his claims, finding that he had not proven that his conditions were work related, and the superior court affirmed the Board. We affirm the Board's finding that the employer rebutted the presumption of compensability. But because the Board failed to make adequate findings to permit review of its decisions that the worker had not proven his claims by a preponderance of the evidence, we vacate the Board's decisions and remand for further findings.

## II. FACTS AND PROCEEDINGS

### A. Pietro's Work And Medical History

Beginning in 1982 Paul Pietro worked for UNOCAL at its urea and ammonia plant in Kenai, first as a physical plant operator and then as a unit coordinator. Sometime around 1985 the physical plant began to burn waste oxazolidone from ammonia and urea production as fuel in one boiler. The waste oxazolidone was considered hazardous because it contained arsenic in concentrations exceeding environmental standards.[1] Oxazolidone was not burned continuously. According to one UNOCAL document, when it was used, oxazolidone constituted about five percent of the "total heat duty of the boiler." UNOCAL stopped burning oxazolidone in 1991 after the Environmental Protection Agency set limits on ambient arsenic levels from burning hazardous waste and UNOCAL determined that the "worst case" emissions from its boiler at the Kenai plant were "several orders of magnitude greater" than these standards.

Oxazolidone was sprayed into the boiler chamber with a gun. When he worked as an operator in the utility plant, Pietro was required to put the gun into the boiler and clean the nozzle of the gun if it plugged up. He and other workers reported that oxazolidone sprayed or spilled from the gun. According to the workers, fumes and smoke came out of the boiler when the gun was changed, and exhaust from the boiler stacks reentered the plant because of what one worker described as a "negative vacuum." In addition, the boiler where the oxazolidone was burned had a number of leaks. A UNOCAL document dated September 22, 1989, indicated that water from a leak in the boiler "contained 0.20 ppm of arsenic." Pietro and another worker testified that Pietro experienced skin contact with arsenic when he slipped in a chemical spill that contained arsenic and saturated his clothes. UNOCAL monitored the arsenic exposure of some employees, but Pietro was never selected to wear a monitor for arsenic exposure. Even after the plant stopped burning oxazolidone, arsenic remained in the boiler. A 2001 memorandum to employees set out detailed procedures to avoid arsenic and lead exposure while repairing the boiler.

According to Pietro, he began to experience burning in his feet in the late 1980s, which he initially attributed to working long hours on his feet. In 1991 Pietro filled out a health questionnaire for UNOCAL, in which he indicated he had tingling in his hands,

1. Arsenic is not a component of oxazolidone, but sodium arsenite, which does contain arsenic, was added during ammonia and urea production to prevent corrosion of processing equipment.

arms, feet, or legs and burning in his arms or legs.[2] His health questionnaires from 1996 though 1999 did not repeat these complaints.

Pietro was diagnosed with rheumatoid arthritis in 1997 and began taking medication to control its effects. In spite of the medication, he had flares of the disease that impaired his ability to work. Pietro began treatment with Michael Armstrong, M.D., a rheumatologist, in August 2001. In March 2002, Dr. Armstrong said that Pietro could "never" return to full duty work because of his rheumatoid arthritis. Pietro eventually received both private disability insurance and Social Security disability benefits for his rheumatoid arthritis.

Pietro first brought his foot pain to the attention of his treating physicians in late 2000 and was seen by a podiatrist, Matt Heilala, D.P.M., in July 2001. Dr. Heilala diagnosed rheumatoid arthritis and plantar fasciitis. Pietro began to see providers at Alaska Alternative Medicine Clinic in 2001 after a friend from work had similar complaints. Chart notes from the clinic showed a neuropathy diagnosis.

In 2001 Pietro's physician at Alaska Alternative Medicine Clinic ordered hair testing for toxin exposure. The hair test showed highly elevated levels of arsenic. In January 2002 Pietro had a urine test for toxic metals, which showed arsenic levels within the "reference range." On the advice of an attorney, Pietro consulted with occupational medicine doctors at Harborview Medical Center in Seattle. The Harborview doctors were skeptical of the validity of the hair test and ordered a twenty-four-hour urine test, even though they noted that the urine test would only reveal current exposure. The urine test showed normal arsenic limits, and the Harborview doctors' reports indicated that arsenic exposure was not a likely explanation for Pietro's neuropathy. But after nerve testing by Dr. Heilala showed evidence of peripheral neuropathy,[3] one of the Harborview physicians, Timothy Takaro, M.D., concluded in October 2002 that the nerve studies were consistent with arsenic poisoning and advised Pietro to pursue a case against UNOCAL.

Pietro also consulted with A. Lee Dellon, M.D., a plastic surgeon whose practice was "entirely devoted to peripheral nerves." Dr. Dellon rejected the idea that Pietro's rheumatoid arthritis caused his peripheral neuropathy and recommended testing to rule out other possible causes of the neuropathy. Dr. Dellon stated that if other possible causes of peripheral neuropathy were ruled out, "then the most likely cause for [Pietro's] peripheral neuropathy would be an occupational exposure to toxins."

Pietro filed a report of occupational injury in October 2002, alleging that exposure to chemicals caused neuropathy in both his feet. UNOCAL controverted all benefits in December 2002, relying on Harborview's initial medical report, which downplayed the role of arsenic in causing the peripheral neuropathy. Shortly after the controversion, Pietro filed a written workers' compensation claim alleging that the neuropathy was the result of work-related chemical exposure.

### B. Other Medical Evidence

UNOCAL set up a panel of four doctors for an employer's independent medical evaluation (EIME) in July 2003. The panel consisted of a podiatrist, an orthopedic rheumatologist, a neurologist, and a toxicologist. None of the EIME doctors found a link between Pietro's symptoms and chemical exposure in the workplace. The podiatrist was not able to confirm a diagnosis of peripheral neuropathy on examination but said that arsenic exposure could lead to peripheral neuropathy. Dejan Dordevich, M.D., the EIME rheumatologist, concluded that Pietro's peripheral neuropathy was "a product of rheumatoid arthritis." Lynne Bell, M.D., Ph.D., the neurologist, was unwilling to diagnose peripheral neuropathy because no nerve conduction or EMG studies had been done, and she recommended further testing.[4]

---

**2.** Numbness, tingling, and burning sensations can all be symptoms of peripheral neuropathy.

**3.** The test done by Dr. Heilala was called "[q]uantitative neurological testing."

**4.** Dr. Bell did not feel that the testing done by Dr. Heilala confirmed the diagnosis.

Brent Burton, M.D., a specialist in occupational and environmental toxicology, also examined Pietro. Dr. Burton reviewed the material safety data sheets for the chemicals that Pietro listed on his workers' compensation claim. Dr. Burton did not think that Pietro's peripheral neuropathy had been properly diagnosed and concluded that Pietro did "not have a diagnosable medical condition stemming from any workplace exposure."

Because of the differences in medical opinions, the parties requested a second independent medical evaluation (SIME). The Board arranged for Pietro to see a neurologist, Jonathan Schleimer, M.D., and a rheumatologist, Neal Birnbaum, M.D. Dr. Birnbaum agreed that Pietro had rheumatoid arthritis but found "no evidence that [Pietro's] rheumatoid arthritis [was] in any way related to any industrial exposure" because "there is no medical literature to support the development of rheumatoid arthritis as a consequence of toxin exposure." Dr. Birnbaum concluded that if Pietro had peripheral neuropathy, it should not be attributed to the rheumatoid arthritis. According to Dr. Birnbaum, neurological problems related to rheumatoid arthritis are rare and "usually occur[] only in the setting of severe active rheumatoid disease." He noted that Pietro's "foot symptoms predate[d] the development of any joint complaints by quite a few years."

Dr. Schleimer did nerve conduction and EMG testing and concluded that Pietro suffered from "a mild polyneuropathy with distal degeneration of sensory axons." Dr. Schleimer thought that Pietro's neuropathy was "likely related to rheumatoid arthritis." He acknowledged that peripheral neuropathy is uncommon in rheumatoid arthritis but considered it "more common than arsenic poisoning or toxicity." Dr. Schleimer also noted "no bone marrow suppression or evidence for a blood count suppression" during Pietro's "period of alleged exposure" and found "no clear documentation of a neuropathy antecedent to" the diagnosis of rheumatoid arthritis. He wrote that if Pietro did not have rheumatoid arthritis, he would consider the possibility of arsenic exposure "more seriously."

To show that his neuropathy was a cause of his inability to work, Pietro submitted to the Board letters from his healthcare providers indicating that he was disabled by his neuropathy. Pietro's attorney sent supplemental interrogatories and documents to the SIME physicians, supplying the doctors with additional medical records and information about chemicals used at the plant. After reviewing the records, Dr. Schleimer stated that he "recognize[d] that there [was] potential for exposure of this patient to heavy metals, arsenic, and other chemicals" but could not state on a more likely than not basis "that the substantial cause of this patient's peripheral neuropathy is related to toxic or heavy metal exposure." The additional information did not change Dr. Birnbaum's opinion.

## C. Board Hearing

The Board held a hearing on Pietro's claim on September 1, 2005. Several of Pietro's coworkers testified about conditions inside the utility plant and problems with the boiler that burned oxazolidone. Pietro's wife testified that the pain in his feet began in the late 1980s. Pietro also testified about his medical history and work conditions. Five doctors testified either in person or by deposition.

The doctors gave sharply differing analyses of the cause and development of Pietro's neuropathy. Dr. Dordevich attributed it to Pietro's rheumatoid arthritis, although he acknowledged that fewer than one percent of patients with rheumatoid arthritis develop a sensory neuropathy like Pietro's. Dr. Dordevich agreed that it was possible Pietro was exposed to some arsenic while he was working for UNOCAL, but he did not think the peripheral neuropathy developed as a result of arsenic exposure because Pietro did not show signs of arsenic toxicity in other organs.

Dr. Burton testified that Pietro's neuropathy was not related to arsenic exposure at his work site. His opinion was based in part on the lack of "objective evidence" that Pietro had been exposed to a toxic level of arsenic. Dr. Burton indicated that there was a problem with trying to quantify Pietro's exposure but thought that Pietro's exposure level

would not result in development of any arsenic-related symptoms. Dr. Burton's testimony suggested that low-level exposure to arsenic was not harmful and that even doses of arsenic high enough to cause acute symptoms did not always cause permanent damage.

In contrast, Dr. Takaro testified that in his opinion arsenic exposure was the most likely cause of the neuropathy because of the type of neuropathy Pietro had. He thought that other possible explanations for the neuropathy had been ruled out, leaving arsenic exposure as the most likely cause. Dr. Takaro identified the basis of his opinion that Pietro had been exposed to sufficient arsenic to cause medical problems, including reliance on UNOCAL's documents. Dr. Takaro also testified that a "burning sensation in either the hands or feet or both" is "the most common" symptom of "longstanding, low-level exposure to arsenic." He indicated that very low levels of arsenic could cause damage.

Dr. Armstrong testified that in his opinion the rheumatoid arthritis did not cause Pietro's peripheral neuropathy. He stated that neuropathy with a burning sensation is as "rare as hen's teeth" in patients with rheumatoid arthritis. Dr. Armstrong believed "more likely than not" that arsenic exposure was "the responsible factor" in Pietro's neuropathy. Dr. Armstrong also agreed that Pietro's peripheral neuropathy was "the major contributing factor" in some of Pietro's disabilities.

In its decision dated November 4, 2005, the Board denied Pietro's claim, finding that he had not proven it by a preponderance of the evidence. The Board found that Pietro had attached the presumption of compensability. It then found that UNOCAL had rebutted the presumption through the opinions of Dr. Dordevich, Dr. Burton, and Dr. Schleimer. In weighing the evidence, the Board focused on "objective" evidence in finding that Pietro had not met his burden of proof. It found that the hair test for arsenic was considered unreliable and the urine test, which it termed the "gold standard," showed normal levels of arsenic. It also found that the opinions of Pietro's doctors about causation were not "supported by the objective, factual record in this case." It gave more weight to the opinions of Dr. Dordevich, Dr. Burton, and Dr. Schleimer, describing them as "based on objective findings." The Board emphasized that Pietro had not developed other symptoms that would have indicated toxic arsenic exposure, such as "gastrointestinal distress, cardiac issues, or dermatologic issues." Pietro appealed the decision to the superior court.

### D. Pietro's Skin Cancer Claim

In April 2006 Pietro was diagnosed with skin cancer. He had three lesions: One was on his shoulder and was diagnosed as melanoma, while the other two were on or near his ears and were diagnosed as basal cell carcinoma. After the skin cancers were diagnosed, Pietro obtained an opinion from Richard Parent, Ph.D., a toxicologist. Dr. Parent indicated that Pietro's skin cancers were consistent with arsenic exposure. Dr. Parent concluded, with a reasonable degree of scientific certainty, that Pietro's medical problems "have been caused or contributed to by his exposures to arsenic during his employment ... at Unocal." In October 2006 Pietro filed a new workers' compensation claim related to the skin cancers and petitioned for modification of the 2005 Board decision based on mistake. At Pietro's request, the superior court stayed the appeal and remanded the case to the Board.

The Board held a hearing in June 2007 on the petition for modification. There was some disagreement about the scope of the hearing: Pietro asked the Board to consider his workers' compensation claim for the skin cancer because it was identified as an issue in the prehearing conference, but the Board decided that it was "not comfortable deciding the compensability of the skin cancer" because of the possibility that Pietro had also been exposed to arsenic while working for Agrium, which bought the ammonia plant from UNOCAL. The Board permitted testimony about the skin cancer because it was a basis of the petition for modification. The Board heard testimony from Dr. Takaro and Dr. Burton as well as some additional testimony from Pietro. Pietro again testified about possible exposure to arsenic at his

work, focusing on exposure to his skin. He also discussed his skin cancers and history of sun exposure.

Dr. Takaro testified about regulatory standards for arsenic exposure. According to Dr. Takaro, based on documents he reviewed, arsenic was present in levels well above the "threshold level" described in some regulations. He testified that there is a latency period of ten to fifteen years between exposure to arsenic and development of skin cancer. In Dr. Takaro's opinion, there was "absolutely no question" that Pietro had been exposed to "much more arsenic" than the general population. He also testified that even though sunlight could have contributed to Pietro's skin cancers, animal studies showed that "arsenic and [ultraviolet radiation] together is a much more potent carcinogen than either one apart." Dr. Takaro expressed the opinion that Pietro's exposure to arsenic while working for UNOCAL was a substantial factor in the development of his skin cancer.

Dr. Burton testified that in his opinion Pietro was not exposed to excessive levels of arsenic during his employment with UNO-CAL. Dr. Burton noted the absence of testing results and industrial hygiene surveys to show exposure levels. He also based his conclusion on his understanding of workplace conditions and Pietro's lack of symptoms while he was working. Dr. Burton disagreed with Dr. Takaro's use of data from emissions testing from the plant's smokestack as a means of showing workplace exposure. He also noted that Pietro never showed signs of certain skin lesions that are consistent with arsenic exposure. In Dr. Burton's opinion, Pietro's skin cancers were most likely the result of sun exposure and aging because he did not believe that Pietro had been exposed to significant levels of arsenic. Dr. Burton testified that the exposure level that triggered skin cancer was not known, although it was "a high level."

The Board found in an August 2007 decision that Pietro had provided enough new evidence to permit it to consider his petition for modification of the neuropathy claim, but it again relied on Dr. Burton's opinion to decide that Pietro had failed to prove that his peripheral neuropathy was work related. Pietro then petitioned for reconsideration of the August 2007 decision because the Board had not resolved his 2006 workers' compensation claim for skin cancer. The Board granted his petition in order to make findings related to this claim and issued its final decision on the skin cancer claim on February 22, 2008. It found that Pietro had attached the presumption of compensability and that UNOCAL had rebutted it; the Board decided that Pietro had failed to prove his skin cancer claim by a preponderance of the evidence.

Pietro appealed the August 2007 and February 2008 Board decisions to the Alaska Workers' Compensation Appeals Commission, which decided that it did not have jurisdiction over the appeal. The superior court consolidated the appeals of all of the decisions. The superior court affirmed the Board's decisions, concluding that substantial evidence in the record supported the Board's findings. The court also decided that (1) the Board had properly applied the presumption analysis; (2) substantial evidence supported the Board's finding that UNOCAL had overcome the presumption; (3) the Board had made sufficient findings to permit review; (4) the Board engaged in reasoned decision making; and (5) the Board had adequately considered Pietro's neuropathy as an occupational disease. Pietro appeals.

### III. STANDARD OF REVIEW

In a workers' compensation appeal from the superior court, we directly review the Board's decision.[5] Factual findings are reviewed to see if they are supported by substantial evidence.[6] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7] The Board is required to

5. *Dougan v. Aurora Elec., Inc.*, 50 P.3d 789, 793 (Alaska 2002).

6. *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000).

7. *Id.* (quoting *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 456 (Alaska 1997)) (internal quotation marks omitted).

make findings only about questions that are both contested and material.[8] "Whether the [B]oard made sufficient findings is a question of law that we review de novo."[9]

## IV. DISCUSSION

### A. UNOCAL Provided Substantial Evidence To Rebut The Presumption.

■ The Board applies a three-step analysis when it evaluates a workers' compensation claim.[10] It first decides whether the employee has provided sufficient evidence establishing a link between his injury and the employment, such that the presumption that his claim is compensable attaches.[11] The Board found here that Pietro had attached the presumption in both of his claims, and UNOCAL does not dispute this finding.

■ In order to rebut the presumption, the employer is required to provide substantial evidence that either "(1) provides an alternative explanation which would exclude work-related factors as a substantial cause of the disability, or (2) directly eliminates any reasonable possibility that employment was a factor in causing the disability."[12] The Board found here that UNOCAL had rebutted the presumption in Pietro's neuropathy claim through the testimony and reports of Dr. Dordevich, Dr. Burton, and Dr. Schleimer. In the skin cancer claim, it found that UNOCAL had rebutted the presumption of compensability through Dr. Burton's testimony. Pietro contends that UNOCAL did not provide sufficient evidence to rebut the presumption in either claim.

■ The Board did not err in finding that UNOCAL presented enough evidence to rebut the presumption. At the second stage, the Board does not weigh the evidence but looks at the evidence provided by the employer in isolation to see if it is adequate.[13]

In his neuropathy claim, Pietro contends that the opinions the Board identified as providing evidence to rebut the presumption were not "comprehensive and reliable" because the doctors were not aware of the evidence of Pietro's exposure to arsenic, assumed the rheumatoid arthritis preceded the neuropathy, and could not rule out all work-related causes of Pietro's neuropathy.

In *Stephens v. ITT/Felec Services*, we held that physicians' opinions were adequate to rebut the presumption when "[t]he physicians based their opinions on a state of facts, which, although disputed, could be permissibly resolved in favor of the employer."[14] Pietro's case is analogous. The physicians here based their opinions about causation in the neuropathy claim on facts that were disputed and could be resolved in favor of UNOCAL, such as whether Pietro was exposed to enough arsenic to have health effects and whether Pietro's neuropathy predated his rheumatoid arthritis. And although Pietro asserts that the doctors' opinions did not rule out any reasonable possibility that the neuropathy was work related, the doctors provided an explanation (Pietro's rheumatoid arthritis) which, if accepted, would exclude arsenic exposure as a cause of the peripheral neuropathy.

■ In the skin cancer claim, the Board relied solely on Dr. Burton's testimony to rebut the presumption. Dr. Burton testified that the most likely cause of Pietro's cancer was sun exposure and aging because he did not think Pietro had been exposed to arsenic at a high enough level to cause skin cancer. In Dr. Burton's opinion, Pietro had been exposed to no more arsenic than the general population. Here again, Pietro's case is similar to *Stephens*. The level of Pietro's arsenic exposure was disputed, and the toxicologists provided conflicting testimony about what

---

**8.** *Bolieu v. Our Lady of Compassion Care Ctr.,* 983 P.2d 1270, 1275 (Alaska 1999).

**9.** *Leigh v. Seekins Ford,* 136 P.3d 214, 216 (Alaska 2006) (citing *Bolieu,* 983 P.2d at 1276).

**10.** *Smith v. Univ. of Alaska, Fairbanks,* 172 P.3d 782, 788 (Alaska 2007) (citing *Bradbury v. Chugach Elec. Ass'n,* 71 P.3d 901, 905 (Alaska 2003)).

**11.** *Id.*

**12.** *Id.*

**13.** *Bouse v. Fireman's Fund Ins. Co.,* 932 P.2d 222, 232 (Alaska 1997) (citing *Veco, Inc. v. Wolfer,* 693 P.2d 865, 869 (Alaska 1985)).

**14.** 915 P.2d 620, 625 (Alaska 1996).

level of arsenic exposure was needed to cause skin cancers. Because the Board only looks at the evidence in isolation at the second stage, without assigning it weight, UNOCAL provided enough evidence to overcome the presumption. Dr. Burton's opinion that Pietro had not been exposed to a high enough level of arsenic at work to cause skin cancer eliminated any reasonable possibility that employment was a factor in causing the cancer.[15]

Pietro argues that in order to overcome the presumption, UNOCAL was required to present objective evidence that its workers were not exposed to arsenic in the workplace.[16] This overstates UNOCAL's burden. UNOCAL's experts and Dr. Schleimer did not contest that Pietro was exposed to some arsenic in his work for UNOCAL. The difficult question was assessing whether he had been exposed to sufficient arsenic to cause the health effects he suffered: peripheral neuropathy and skin cancer. Both sides presented expert testimony supporting their positions, and UNOCAL's experts' testimony, viewed in isolation, provided sufficient evidence to rebut the presumption.

█ If the employer rebuts the presumption, the Board must weigh the testimony in deciding whether a worker has proven his claim by a preponderance of the evidence.[17] The Board found that Pietro had not proven either of his claims by a preponderance of the evidence. In the neuropathy claim, the Board found that the opinions of Pietro's physicians were "not supported by the objective, factual record in this case." It then noted that the twenty-four-hour urine test was negative and that Dr. Takaro "ultimately concluded that the employee's neuropathies [were] 'inexplorable.'" The Board "[found] it

telling" that Pietro had no other symptoms associated with toxic arsenic exposure, including "dermatologic issues."

The Board listed three reasons for rejecting Pietro's skin cancer claim: (1) UNOCAL stopped burning arsenic more than eleven years before Pietro's cancer diagnosis; (2) "the most common cause of skin cancer is exposure to ultraviolet light (the sun)"; and (3) Dr. Burton testified "that there is zero relationship between the type of carcinoma/melanoma the employee had and arsenic exposure." In its decision denying the skin cancer claim, the Board did not specifically reject Dr. Takaro's opinions.

## B. The Board's Findings Are Inadequate To Permit Appellate Review.

Pietro contends that the Board's findings are inadequate to permit review because the Board failed to make findings about material and contested facts. According to Pietro, the Board was required to make findings about the lay testimony here because that testimony undermined the opinions of UNOCAL's experts. He also argues that the Board "made many significant errors" in its decisions. UNOCAL concedes that there are errors in the Board's decisions but asserts that the errors were not significant. It maintains that the Board's factual findings were adequate.

█ The Board is required to make findings about issues that are both contested and material.[18] "Findings are adequate to permit appellate review when 'at a minimum, they show that the Board considered each issue of significance, demonstrate the basis for the Board's decision, and are sufficiently detailed.'"[19] Here, the Board's findings failed

---

15. *See Smith*, 172 P.3d at 788 (holding that an employer "may rebut the presumption by presenting substantial evidence ... that directly eliminates any reasonable possibility that employment was a factor in causing the disability" (citing *Bradbury*, 71 P.3d at 906)).

16. Pietro also claims that the Board erred in saying that he "acknowledge[d]" UNOCAL overcame the presumption. Even though the Board's statement was inaccurate, we see no indication that this misperception influenced the Board's decision. The Board identified the evidence on which it relied to find that UNOCAL

rebutted the presumption, and that evidence was adequate.

17. *Smith*, 172 P.3d at 788.

18. *Bolieu v. Our Lady of Compassion Care Ctr.*, 983 P.2d 1270, 1275 (Alaska 1999).

19. *Lindhag v. State, Dep't of Natural Res.*, 123 P.3d 948, 953 (Alaska 2005) (quoting *Stephens*, 915 P.2d at 629 (Matthews, J., dissenting in part)).

to meet this standard. Not only did the findings neglect to address significant, disputed issues, such as when Pietro's neuropathy began relative to his arthritis and whether his work conditions exposed him to enough arsenic to cause health complaints, but the Board's analyses also did not evaluate the lay testimony and its interaction with the experts' opinions. The Board's lack of detailed analysis makes it difficult to discern its reasoning, which is particularly troubling in light of the conceded errors in its decisions.

### 1. The Board erred in failing to evaluate the lay testimony.

As we discussed in *Smith v. University of Alaska, Fairbanks*, lay testimony does not always have probative value in complex medical cases.[20] But at times lay testimony is "highly relevant," especially when "it tends to support or contradict the assumptions as to the facts of the claimant's history on which expert medical witnesses rely."[21] In Pietro's case, the lay testimony was relevant to two contested issues underlying the medical experts' opinions: when Pietro's neuropathy developed relative to his rheumatoid arthritis and whether his work conditions exposed him to enough arsenic to cause health complaints. These issues were both contested and material.

Pietro introduced three types of evidence to support his claim that he had been exposed to hazardous levels of arsenic at work: lay testimony about his work and health conditions, documentary evidence from UNOCAL obtained through discovery, and expert testimony.[22] The UNOCAL documents contained information about boiler problems and levels of arsenic in the environment both inside and near the plant. The toxicologists expressed opinions about Pietro's potential exposure, and their opinions were based in part on their understanding of his work con-

ditions. Dr. Takaro used environmental testing data from UNOCAL documents together with information about Pietro's workplace to conclude that Pietro had been exposed to significant levels of arsenic. Dr. Burton testified that to evaluate exposure he looked at Pietro's "description of his work practices."

The lay testimony Pietro presented was relevant to the doctors' assumptions about his exposure to arsenic. The Board briefly summarized the lay testimony in the neuropathy decision but did not mention it in its analysis of either the neuropathy or cancer claim and made no findings about either the lay witnesses or their testimony. Information about Pietro's work conditions was necessary to evaluate the compensability of his claim because that testimony could "support or contradict" the toxicologists' assumptions about Pietro's work conditions, as the lay testimony did in *Smith*.[23] For example, Dr. Burton testified that burning oxazolidone would not present an exposure hazard if the fumes were contained in the boiler; he also said that there was "no history ... to indicate that [Pietro] was working in an environment where there were products of combustion in the workplace." Yet the lay witnesses testified that there was smoke in their work area; witnesses also testified that exhaust from the boiler was drawn back into the building. Because the lay testimony was relevant to the experts' assumptions about Pietro's work conditions and his potential exposure to arsenic at work, the Board was required to evaluate and make findings about it. The Board's failure to make findings about the work conditions, especially as it related to Pietro's exposure to arsenic in the workplace, impedes adequate appellate review of its decision.[24]

Pietro also presented lay testimony that he suffered from peripheral neuropathy in the late 1980s to support his contention that his neuropathy developed before his rheumatoid

**20.** 172 P.3d at 789.

**21.** *Id.* at 790.

**22.** UNOCAL suggests that Pietro was required to quantify precisely his exposure to arsenic at work. It asserts that "[a]t no point is [Pietro] able to document duration, level, nature, and amounts of exposure." We disagree with UNO-

CAL that Pietro's inability to quantify exactly his exposure at work would have been a proper basis for the Board's rejection of his claim.

**23.** 172 P.3d at 790.

**24.** *See Stephens,* 915 P.2d at 627.

arthritis. The relative date of onset of the neuropathy and arthritis was an important, contested issue in this case. Dr. Schleimer, the SIME neurologist, did not think there was adequate medical evidence that Pietro's neuropathy developed before his rheumatoid arthritis but also stated that he would consider the possibility of arsenic exposure "more seriously" in the absence of rheumatoid arthritis. The lay testimony here, like the lay testimony in *Smith*, provided information relevant to the experts' assumptions about the development and course of Pietro's symptoms.[25] On remand, the Board must make findings about the lay testimony.

## 2. The Board's findings do not show consideration of significant issues.

■ The fundamental question before the Board was whether Pietro's neuropathy was caused by exposure to toxins over a long period of time or by his rheumatoid arthritis. In order to decide this question, the Board needed to resolve a number of issues: whether the peripheral neuropathy arose before the arthritis, whether low levels of arsenic are toxic over a long period of exposure, and, relatedly, whether Pietro had been exposed to levels of arsenic that caused health effects. After Pietro's skin cancer diagnosis, the Board needed to consider whether that diagnosis altered its assessment of his neuropathy claim. We agree with Pietro that the Board failed to make findings about these significant issues.

The date of onset of the neuropathy was an important, disputed fact underlying several doctors' opinions. Both SIME physicians mentioned the time of onset of the neuropathy in assessing whether Pietro's rheumatoid arthritis caused his neuropathy. Dr. Birnbaum concluded that Pietro's rheumatoid arthritis could not be a causative factor in the neuropathy in part because he thought the neuropathy predated the arthritis diagnosis. In contrast, Dr. Schleimer thought that the neuropathy arose after the rheumatoid arthritis and the arthritis caused the neuropathy. Pietro provided lay testimony as well as his health questionnaire to support his posi-

tion that his neuropathy developed before his arthritis. UNOCAL argued that no medical evidence supported Pietro's position. Yet the Board failed to discuss or make findings about when the neuropathy arose relative to Pietro's rheumatoid arthritis.

The Board also failed to make findings about Pietro's potential exposure to arsenic or about the conditions in Pietro's workplace, even though these conditions bore upon the crucial question of his exposure level. Aside from the lay testimony about work conditions at the plant, the Board had UNOCAL's documents, which had some testing data, as well as expert testimony from the toxicologists. The experts reached significantly different conclusions about the level of Pietro's exposure to arsenic and its possible health effects. Dr. Burton thought that Pietro's exposure level was similar to that of the general population and inadequate to cause health effects. Dr. Takaro concluded that Pietro's workplace exposure was much higher than that of the general population and was more than sufficient to cause Pietro's symptoms. The Board's findings do not mention Pietro's work conditions. Although the evidence may not have permitted the Board to come up with a number precisely quantifying Pietro's exposure level, the Board had sufficient evidence to evaluate the expert testimony, make a finding regarding Pietro's exposure to toxins, and explain the finding.

Finally, the toxicologists gave conflicting testimony about whether low levels of arsenic exposure could cause health effects. Dr. Burton testified that arsenic exposure would have to rise to the level of "intoxication" or "poisoning" in order to cause health effects. Dr. Takaro testified that arsenic could cause damage at much lower levels than the levels discussed by Dr. Burton and cited medical literature to support his opinion. The Board did not resolve this conflict. Nor did it adequately explain its reasoning rejecting Pietro's modification petition. The Board denied Pietro's neuropathy claim in part because Pietro did not have a dermatologic condition consistent with arsenic exposure. Yet after he presented evidence of a skin

**25.** 172 P.3d at 790.

condition that could be related to arsenic exposure, the Board failed to reconcile its first opinion with this new fact, except in a conclusory fashion that provided no insight into its reasoning.

### 3. The Board's findings are not detailed enough to show the basis for its decisions.

 In its decision on the neuropathy claim, the Board found that Dr. Takaro's, Dr. Armstrong's, and Dr. Dellon's opinions "regarding causation [were] not supported by the objective, factual record in this case." The Board's finding is difficult to review because it does not explain what facts in the record undermined these doctors' opinions. Dr. Takaro based his opinions in part on the objective findings in the EMG and nerve conduction studies, which showed that Pietro had a specific type of nerve damage. Dr. Takaro also looked at data from environmental testing provided by UNOCAL to support his opinion about exposure levels. The Board's conclusory statement does not provide enough information to assess its accuracy. By contrast, we determined in *Lindhag v. State, Department of Natural Resources* that the Board's decision was adequately detailed.[26] There, the case involved only medical issues; the Board relied on one doctor, the SIME physician, and gave its reasons for crediting that doctor's opinions instead of two others' opinions.[27] The reasons given there—that one doctor lacked training in a relevant specialty and the other doctor made factual errors in his report (which the Board identified)—were amenable to review and readily understandable.[28] Because the Board provided no concrete reasons for rejecting the testimony of Dr. Takaro, Dr. Armstrong, and Dr. Dellon, we are unable to review this decision.

In rejecting Pietro's neuropathy claim, the Board also focused on the results of the twenty-four-hour urine test, which were normal, and the unreliability of the hair test, which showed elevated arsenic levels. We agree with Pietro that the Board placed too much emphasis on the results of the twenty-four-hour urine test. UNOCAL defends the Board's reasoning, arguing that Pietro needed to provide a positive medical test result showing work-related arsenic exposure to substantiate his claim. But there is no rigid requirement that a worker prove his claim by means of a specific medical test,[29] and by requiring Pietro to do so here, without consideration of the circumstantial evidence of arsenic exposure, the Board erred. This is particularly so when the test at issue measured ongoing exposure and had little probative value of Pietro's exposure to arsenic during his employment at UNOCAL. The experts agreed that arsenic is excreted rapidly from the body, and the doctor who ordered the twenty-four-hour urine test indicated that it would only show ongoing exposure, not exposure that had occurred years before the test. Pietro underwent the urine test about two months after Dr. Armstrong took him off work because of his arthritis; this suggests that the negative urine test result was not probative of Pietro's exposure at UNOCAL.

Medical testing can provide important objective evidence in workers' compensation cases, but it is not the only way a worker can prove his claim.[30] Dr. Burton, Dr. Takaro, Dr. Armstrong, and Dr. Schleimer arrived at their conclusions about causation using differential diagnosis methodology, not by using different "objective" tests. None of the doctors disputed that the type of nerve damage Pietro suffered could be associated with arsenic exposure. Dr. Schleimer stated that he "[could] not rule out the possible work-relat-

---

**26.** 123 P.3d 948, 953–54 (Alaska 2005).

**27.** *Id.*

**28.** *Id.* at 952–54.

**29.** *See AT & T Alascom v. Orchitt*, 161 P.3d 1232, 1242 (Alaska 2007) (citing *Beauchamp v. Employers Liab. Assurance Corp.*, 477 P.2d 993, 996–97 (Alaska 1970)) (holding that the Board per-

missibly relied on expert medical and lay testimony to find that a worker suffered work-related overexposure to radiation).

**30.** *See Bolieu v. Our Lady of Compassion Care Ctr.*, 983 P.2d 1270, 1275 n. 19 (Alaska 1999) (citing *Beauchamp*, 477 P.2d at 996) ("Evidence of work-relatedness need not consist solely of medical or scientific testimony.").

ed contributing causes, i.e., exposures" and "[i]f [Pietro] had no other explanation for the neuropathy, i.e. did not have rheumatoid arthritis, I would consider [arsenic poisoning or toxicity] more seriously."[31] The doctors reached different conclusions about the cause of the neuropathy based on differences in their understanding of Pietro's exposure level, his other health conditions, the likelihood that those conditions could cause the type of nerve damage Pietro had, and the dates of onset of the conditions.

 The Board's findings on the skin cancer claim are also inadequate. The Board did not, in its decision rejecting this claim, explicitly reject Dr. Takaro's testimony; in fact, it cited his testimony to support its finding that ultraviolet radiation is the most common cause of skin cancer. But Dr. Takaro testified that arsenic and ultraviolet radiation in combination are a more potent carcinogen than either one alone "so that the combination on a sun-exposed area, like in this case the ears, would make it even more likely that there is a relationship between the two." The Board's finding that sunlight is the most common cause of skin cancer also does not adequately explain its reasoning in light of its references to Dr. Takaro's testimony and Dr. Takaro's statement that Pietro's cancers in sun-exposed areas made arsenic causation more likely.

The Board found that Dr. Burton testified that "there [was] zero relationship between the type of carcinoma/melanoma the employee had and arsenic exposure." Our review of the record does not support this finding. Dr. Burton testified that squamous cell cancer was most commonly associated with arsenic exposure, but that it was "possible" for basal cell carcinoma—one type of cancer Pietro had—to be caused by arsenic exposure. Dr.

Burton thought that arsenic exposure was not a likely cause of Pietro's cancer because he did not think Pietro had been exposed to enough arsenic, not because there was "zero relationship" between basal cell carcinoma and arsenic exposure. And, as noted above, the Board failed to make any findings about Pietro's level of arsenic exposure.

We are troubled by the errors in the Board's decisions. UNOCAL concedes that the Board's decisions contain errors but argues that they are harmless. Some of the Board's mistakes are harmless: As we explained above in Part IV.A, even though the Board incorrectly stated that Pietro acknowledged that UNOCAL had rebutted the presumption, the Board cited adequate evidence to support its finding that UNOCAL had done so.

But other mistakes are not so easily excused. The Board's statement, which UNOCAL concedes is incorrect, that Dr. Takaro "ultimately concluded that the employee's neuropathies [were] 'inexplorable'" is part of the Board's analysis explaining why it did not give Dr. Takaro's opinion as much weight as Dr. Burton's. UNOCAL asserts that this finding was not significant because "there [was] still a lack of evidence showing that arsenic was a substantial factor in causation of this condition." But besides testifying that after a certain point "demyelinization just continues inexorably," Dr. Takaro testified that a "burning sensation in either the hands or feet or both" is "the most common" symptom of "longstanding, low-level exposure to arsenic." He indicated that very low levels of arsenic could cause damage if the exposures occurred over a long period of time. Similarly, UNOCAL agrees that the Board was incorrect in finding that "all doctors [had] opined" that Pietro's neuropathy

---

**31.** Pietro asserts that the Board applied the incorrect legal standard for causation because it relied on Dr. Schleimer's report. In his later report, Dr. Schleimer wrote that he could not say that "the substantial cause" of Pietro's neuropathy was "related to toxic or heavy metal exposure." The relevant legal standard that applied to Pietro's claim was "a substantial factor." *See Carter v. B & B Constr., Inc.,* 199 P.3d 1150, 1157 (Alaska 2008) (noting that the work-related injury must be a substantial factor in causing a disability). The legislature changed the standard

to "the substantial factor" in 2005. Ch. 10, § 9, FSSLA 2005. Pietro equates Dr. Schleimer's use of "the substantial cause" with use of "the substantial factor" as a legal standard. Pietro was unable to identify any indication that the Board used "the substantial factor" as the legal test to evaluate Pietro's claim rather than "a substantial factor." Although Dr. Schleimer's use of the phrase "the substantial cause" was unfortunate given the change in the law, we see no evidence that the Board applied the incorrect causation test to Pietro's claim.

would be accompanied by other symptoms if it were related to arsenic exposure; it nonetheless contends that the error is harmless. But this erroneous factual finding was one of the Board's chief reasons for denying Pietro's neuropathy claim. The Board's factual mistakes cast doubt on its conclusions, particularly given the lack of a detailed or rigorous rationale explaining its decision.[32]

## V. CONCLUSION

For the reasons stated, we AFFIRM the Board's finding that UNOCAL rebutted the presumption of compensability. We VACATE the Board's decisions denying Pietro's claims and REMAND to the Board to make appropriate findings regarding whether Pietro proved his claims by a preponderance of the evidence.

---

**32.** Pietro contends that the Board failed to apply the definition of occupational disease to his case. Because we are remanding the case for further findings, we do not address this issue.