*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| GREGORY WEAVER, | ) | |
| | ) | Supreme Court No. S-17406 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 17-025 |
| | ) | |
| ASRC FEDERAL HOLDING | ) | O P I N I O N |
| COMPANY and ARCTIC SLOPE | ) | |
| REGIONAL CORPORATION, | ) | No. 7454 – June 5, 2020 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Michael J. Jensen and Lee D. Goodman, Law Offices of Michael J. Jensen, Anchorage, for Appellant. Matthew T. Findley and Laura C. Dulic, Ashburn & Mason, P.C., Anchorage, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

BOLGER, Chief Justice.

## I. INTRODUCTION

A laborer began receiving workers' compensation benefits after experiencing severe low back pain at a remote job site. About six months later his employer controverted all benefits based on a medical opinion that the work caused only

a temporary aggravation of a preexisting condition.  The laborer underwent extensive medical care for his back pain, with doctors trying multiple different treatments.  The worker sought workers' compensation for the back pain and asked the Alaska Workers' Compensation Board to join a prior back injury claim against the same employer. Following a lengthy and complex administrative process, the Board denied the worker's claim for additional benefits, and the Alaska Workers' Compensation Appeals Commission affirmed the Board's decision.

The laborer contends that the Board made both procedural and substantive errors.  He argues the Board violated his right to due process by relying on evidence from an employer's medical evaluation (EME) and the second independent medical evaluation (SIME) ordered by the Board.  The doctors who performed those evaluations reviewed reports from two other doctors who were not called to testify at the hearing, even though the laborer had requested cross-examination of them.  We conclude that the Board adequately protected the laborer's rights by excluding the reports from its own consideration and by providing a full opportunity for cross-examination of the EME and SIME physicians.  We also conclude that the opinions from the EME, the SIME, and other medical evidence were sufficient both to rebut the presumption of compensability and to support the Board's decision that the continuing need for treatment was not work related.  We also find no error in the Board's decision to address the previous work injury in a separate case.  We affirm the Commission's decision.

## II. FACTS AND PROCEEDINGS

### A. Work Injury

Gregory Weaver worked at remote sites for ARCTEC Alaska[1] off and on for several years as a relief station mechanic. His job involved heavy labor, and he filed several reports of injury during the times he worked for ARCTEC. He reported in December 2010 that he had "pulled something in the lower spinal area" while adjusting tire chains on a dump truck. He filed another injury report related to his back in early 2012, after he experienced back pain while installing garage door panels. Weaver passed "fit for duty" physical examinations after both of these injuries.

Weaver worked at Indian Mountain and Barter Island in 2013. In July while Weaver was at Barter Island, he woke up one morning with back pain that made it hard for him to walk. He said his back pain "had been building up for several months," but he could not identify a specific task related to the onset of pain. He said "the majority of the heavy lifting" he did that summer had been at Indian Mountain, but he described work at Barter Island as including significant shoveling and pushing wheelbarrows of rocks over difficult surfaces. He thought the camp bed provided inadequate back support. He asked to be flown out because of his back pain and has not worked since.

### B. Weaver's Medical History

Many years before Weaver began to work for ARCTEC he was in a serious motor vehicle collision and suffered a traumatic brain injury, which caused continuing memory problems. Weaver was evidently involved in a second accident in about 2003,

---

[1] The parties generally referred to Weaver's employer as ARCTEC Alaska, but the opening notice in the Board file referred to it as ASRC Federal Holding Company. Arctic Slope Regional Corporation is the insurer for ARCTEC Alaska. We refer to the employer and its insurer as "ARCTEC Alaska" or "ARCTEC."

but the record in this case has little information about that accident. Weaver had a history of mood disorders, which a brain injury specialist said was likely related to the traumatic brain injury.

The parties to this litigation disputed the existence and relevance of Weaver's substance abuse. Weaver was given an administrative discharge from the military related to alcohol abuse and "rehabilitation failure." Weaver has been convicted twice of driving under the influence, once in the 1990s and once in 2014. In 2014 Weaver voluntarily entered a dual-diagnosis[2] in-patient treatment program in Georgia, but the program is only mentioned in other providers' records. In February 2017, a short time before the Board hearing, he was again arrested and charged with driving under the influence but was convicted only of reckless driving. The pain clinic that treated Weaver's back pain tested him periodically for alcohol; more than once he tested positive.

Weaver's medical records show sporadic back pain treatment during the ten years before his pain became debilitating. Most treatment was chiropractic care or osteopathic manipulation, and some of the treatment was for work-related complaints.

## C. Medical Treatment And Evaluation Following The 2013 Injury

Weaver began treatment with Dr. Joyce Restad when he returned from Barter Island in late July 2013. He had not previously seen Dr. Restad and chose her because she was the only Mat-Su Valley osteopathic physician he found offering osteopathic manipulation. At his first appointment with Dr. Restad his pain was

---

[2]     The term "dual diagnosis" refers to the co-occurrence of a substance abuse disorder and a mental disorder in an individual. Nat'l Insts. of Health, *Dual Diagnosis*, MEDLINEPLUS, https://medlineplus.gov/dualdiagnosis.html (last visited May 18, 2020).

"a '9'/10." She diagnosed him with lumbago[3] and somatic dysfunction[4] in the lumbar region and treated him with osteopathic manipulation and medication. An MRI from early August showed disc bulging in the lumbar spine with "moderate bilateral neural foraminal stenosis" at L5-S1.

Dr. Restad referred Weaver to Algone Pain Center, where he saw several providers and continued to receive care through 2017. Algone initially suggested a series of three epidural steroid injections. Dr. Restad's chart notes reflect that ARCTEC's nurse case manager[5] considered the proposed treatment "aggressive" and wanted a second opinion and that Weaver "seem[ed] to be neutral about this." Dr. Restad referred Weaver to Dr. Shawn Johnston at Alaska Spine Institute as suggested by the case manager.

The underlying question about the epidural steroid injections, beside cost, appears to have been whether Weaver had radiculopathy, or "irritation of or injury to a nerve root (as from being compressed)."[6] Radiculopathy occurs in a pattern related to a specific nerve root, which in Weaver's case would have resulted in pain extending into the leg. Weaver's medical records did not consistently show pain in the leg. Dr. Restad's chart notes described the pain as "radiating into his [left] buttock."

---

[3] Lumbago is lower back pain. *Lumbago*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/lumbago.

[4] One doctor testified that "somatic dysfunction" is "not a specific diagnosis" but indicates that the spine is "not working properly." Dr. Restad testified she uses this diagnosis when she does an adjustment.

[5] ARCTEC hired a nurse case manager in Weaver's case; she monitored care, including scheduling at least one appointment, and went to several appointments with Weaver.

[6] *Radiculopathy*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/radiculopathy.

Dr. Johnston thought Weaver's pain was "facet-mediated"[7] and restricted him to light duty work. After noting Weaver's "occasional radicular complaints," Dr. Johnston referred Weaver for physical therapy and prescribed other medication. Weaver attended physical therapy but showed little improvement. Dr. Johnston later prescribed lumbar traction, which was unhelpful, and continued work restrictions. Weaver attended physical therapy regularly but showed no significant improvement; a work-hardening program intended to gradually prepare Weaver for a return to work was also unsuccessful. In November 2013 Dr. Johnston considered releasing Weaver to full time work but did not do so.

Dr. Johnston suggested medial branch blocks, a diagnostic procedure to identify which facets cause pain, as an option if Weaver did not improve with physical therapy, but he did not specifically order them. In a medial branch block nerves related to facets at a specific level of the spine are temporarily numbed; if pain is reduced or relieved, doctors conclude that facets at the corresponding level are the pain source. The nerve can then be treated with radiofrequency ablation (RFA) for more permanent pain relief. Algone later performed medial branch blocks on Weaver.

In January 2014 ARCTEC arranged an employer's medical evaluation (EME) with Dr. Stephen Marble. Dr. Marble diagnosed "[m]ultilevel lumbar degenerative disc disease, greatest at L5-S1." Dr. Marble said there was "potential for work factors (as described) causing symptomatic exacerbation" and thought Weaver "had evolving degenerative disc disease symptoms over the course of approximately three years." Dr. Marble did not think the July 2013 injury was the substantial cause of Weaver's disability and need for medical treatment, but he did say the work activities

---

[7] Facet-mediated pain is pain related to the facets, the spinal joints that connect the vertebral bodies.

"resulted in a temporary aggravation/exacerbation of Mr. Weaver's preexisting lumbar condition." Dr. Marble thought Weaver was medically stable but said Weaver should be limited to work in the "light-medium" physical demands category and should not return to work as a station mechanic. ARCTEC controverted all benefits in late January 2014 based on Dr. Marble's report. After the controversion the nurse case manager met with Dr. Johnston, without Weaver in attendance, to "fill out paperwork." Dr. Johnston signed a "check the box" form letter, written by the nurse case manager, indicating his agreement with Dr. Marble's report.

Dr. Restad wrote a letter supporting Weaver, and Weaver filed a written workers' compensation claim in February 2014. ARCTEC denied that further benefits were due but agreed that a second independent medical evaluation (SIME) was appropriate.

Weaver continued to see Dr. Restad until February 2015. After the controversion he sought medical care referrals from the Veterans Administration (VA). A VA physician assistant noted "moderate" radiculopathy on the right and "mild" radiculopathy on the left when examining Weaver. The VA authorized care with Dr. Samuel Inouye, a family practice doctor. Dr. Inouye ordered an MRI in July 2014 at the VA's request; the MRI showed that Weaver's spine was essentially unchanged since August 2013. Shortly after seeing Dr. Inouye, Weaver saw Dr. Andrea Trescot, a pain physician, on referral from Dr. Restad. Dr. Trescot thought Weaver's back pain was work related; she recommended a transforaminal epidural steroid injection[8] and wrote that Weaver had "never received adequate treatment" for his low back pain and was therefore not medically stable.

---

[8] Dr. Trescot later explained that a transforaminal epidural injection involves injecting an "individual nerve root as it's coming out of [the] foramen," which is "the opening where the nerve root exits" the spine.

Weaver consulted Dr. Louis Kralick, a neurosurgeon, in October 2014 on referral from the VA. Dr. Kralick did not discern any radicular symptoms but ordered further testing. Algone performed a second epidural steroid injection that month because Weaver had "2 days of excellent relief" after the epidural steroid injection administered by Dr. Trescot.

On October 30, 2014, Weaver saw Dr. Amy Murphy for the first time for treatment related to cognition and his old brain injury; this care was authorized by the VA. Dr. Murphy did not treat Weaver for pain but prescribed an antidepressant and a muscle relaxant. Dr. Murphy noted in October that Weaver "[was] having a great deal of psychosocial stressors" including his wife filing for divorce, the workers' compensation controversion, a need for financial assistance from his parents, and a lack of income "for months." In addition, he had been unable to visit his children and had a heart attack. The VA medical records from earlier in 2014 indicate that Weaver was at one point "overwhelmed with stress" including a divorce, "severe debt," inability to work, his workers' compensation "appeal," and "chronic pain issues." In November 2014 Dr. Murphy noted that "[t]herapy is not helping a great deal but then again his stressors continue to be high and this is definitely not helping his care."

Algone continued to provide treatment for Weaver's back pain, using different medications for pain relief. An MRI from December 2014 showed that Weaver's lumbar condition was stable. In early January 2015 Algone performed a third epidural steroid injection. At about this time Dr. Kralick recommended facet injections at two levels in the lumbar spine.

In late January 2015 Algone recommended "diagnostic lumbar facet blocks" for "mechanical low back pain," and Weaver underwent medial branch blocks at several levels, reporting "80% relief" that "lasted for 5 hours." The branch blocks were repeated, but Weaver experienced less pain relief after the second procedure. At

about this time Weaver's urinalysis (UA) at Algone showed that he was drinking alcohol, and Weaver told the doctor he drank "to help with the pain."

In March 2015 Dr. Patrick Radecki did his first EME for ARCTEC. Dr. Radecki did not think Weaver had suffered any injury at work; he said Weaver had degenerative disc disease related to age and weight. Dr. Radecki reported that Weaver had "nonphysiologic" responses to touch and certain maneuvers on examination. Dr. Radecki thought Weaver's pain was mainly caused by psychosocial factors but did not think a psychological evaluation was necessary "to determine if there are any psychological factors at play because [he and ARCTEC] already kn[e]w that from a comprehensive physical exam, such as [he had] performed." Dr. Radecki thought a psychological evaluation might bolster the evidence ARCTEC could present, even though he felt psychological factors were "the only explanation for [Weaver's] presentation." Dr. Radecki noted that a brain MRI showed changes related to Weaver's old head injury, which would cause "poor recall." He suggested that Weaver might "have some atypical response to the normal aches and pains of daily living or may have a tendency to develop a perseveration of complaints that are nonphysiologic, in part because of his pathology in his brain."

In spring 2015 Algone recommended RFA therapy at the facet levels corresponding to the medial branch blocks. Algone continued to be concerned about Weaver's use of alcohol, warning that the clinic would not prescribe pain medication if Weaver "continue[d] to drink at this level." Weaver underwent RFA therapy, but it did not bring the expected relief. Algone treated Weaver's pain with multiple medications. In August Algone referred Weaver back to Dr. Kralick for surgical evaluation.

Weaver underwent a SIME examination with Dr. James Scoggin in December 2015. Dr. Scoggin diagnosed degenerative disc disease, chronic low back pain, and an "industrial" soft tissue injury in July 2013. Dr. Scoggin said there was "no

objective evidence of a permanent aggravation" of Weaver's degenerative disc disease or his chronic low back pain, and he thought Weaver was medically stable from the effects of the July 2013 injury by the date of Dr. Marble's January 2014 EME. In explaining his opinion about medical stability, Dr. Scoggin first noted Dr. Marble's opinion that Weaver was medically stable and then noted that Dr. Johnston "concurred with" Dr. Marble's conclusions. Dr. Scoggin observed that the pain levels Weaver reported at the SIME examination were similar to those in Dr. Marble's report. Dr. Scoggin summarized the treatments Weaver had undergone in the intervening time and noted the lack of improvement in Weaver's pain levels. Dr. Scoggin gave the opinion that Weaver would likely not be able to return to the heavy labor he had performed in the past because of both his lumbar spine condition and his cardiac problems. Dr. Scoggin issued several supplemental reports but did not change his opinion.

In early April 2016 Algone performed a discogram,[9] which Dr. Kralick had recommended, and Weaver reported an immediate reduction in pain. The pain relief was short-lived, however, and Algone continued the pain regimen it had established for Weaver. A June 2016 UA tested positive for alcohol.

In May Dr. Kralick discussed spinal fusion surgery with Weaver because of his lack of improvement after other treatment. An early July assessment note recorded "bilateral L5/S1 radiculopathies." Weaver opted to have surgery, and in mid-July 2016 Dr. Kralick performed an "L4-S1 laminectomy with spinal canal and neural foraminal decompression" and "disc excision of left L4-L5." The operative report indicated

---

[9] A discogram injects fluid with dye into a disc to increase pressure and attempt to reproduce the patient's pain. The dye allows a physician to see if the disc is leaking and may help determine whether the disc is causing the pain. Algone injected an anesthetic with dye into the discs.

Weaver had "[s]ignificant canal compromise of the thecal sac . . . at both the L4-5 and L5-S1 levels."[10] Dr. Kralick's "Brief Operative Note" gave a diagnosis of "[s]pondylosis of lumbar region without myelopathy or radiculopathy."

Weaver followed up with Dr. Kralick's office and continued treatment at Algone for chronic pain. He reported to Algone that he had decreased pain following surgery: in January 2017 he reported "an average pain level of 3-5/10," and in March 2017 he rated his pain at three out of ten at the time of the appointment, with an average of three to four when using medication. Weaver's pain medication was decreased by half at that time. In May 2017 he reported that the decreased dosages were adequate for his pain, and gave an average pain level of three to five.

In mid-February 2017 ARCTEC scheduled another EME. At ARCTEC's request, Dr. Radecki referred Weaver to Dr. Ronald Teed, an orthopedic surgeon. Dr. Teed thought Weaver's back pain was degenerative in nature, specifically that it was the result of arthritic changes. He did not think any of Weaver's medical problems were work related. ARCTEC asked Dr. Teed questions related to both the 2010 and the 2013 injury reports; Dr. Teed thought Weaver was medically stable as of the date of both injuries.

### D.     Board Proceedings, Including Medical Depositions

This was a very contentious case with considerable litigation, so we summarize only the proceedings relevant to this appeal. Weaver filed a written workers' compensation claim after the January 2014 controversion; he filed an amended claim in June 2014 related to the July 2013 injury, seeking temporary total disability (TTD) from

---

[10]     The thecal sac is "the membranous sac of dura mater covering the spinal cord and cauda equina and containing cerebrospinal fluid." *Thecal sac*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/medical/thecal%20sac.

the date of the controversion, medical costs, permanent partial impairment (PPI), and reemployment benefits. His injury theory was in the alternative: there was either a "traumatic incident" or a "cumulative trauma" or both. Weaver also filed a Request for Cross-Examination, seeking to cross-examine Dr. Marble about his EME report and Dr. Johnston about his February "check the box" letter.

In October 2014 Weaver filed a petition to join an additional employer, asking the Board to join his earlier injuries with ARCTEC to the 2013 injury.[11] He listed two additional reported injuries, one from December 2010 and one from June 2011, both against ARCTEC Alaska and both to his low back. ARCTEC did not oppose the petition to join and objected to a hearing when Weaver asked for one.[12] A later prehearing conference summary shows that the 2010 case, related to adjusting tire chains, was joined with the 2013 case, and the Board assigned the 2013 number as the master case number.[13]

The parties deposed Dr. Scoggin in August 2016, about six weeks after the back surgery. He reiterated his opinions about the 2013 injury and its effects on Weaver's degenerative disc disease. Dr. Scoggin called Weaver's pain "multifactorial,"

---

[11]     *See* 8 Alaska Administrative Code (AAC) 45.040 (2011) (allowing joinder of parties). Weaver did not explain why he petitioned to join an additional employer to the 2013 injury claim, but it appears he was using a process like that used in last injurious exposure rule cases. *See Morrison v. Alaska Interstate Constr., Inc.*, 440 P.3d 224, 228 (Alaska 2019) (summarizing process used to join first employer in last injurious exposure rule case).

[12]     *See* 8 AAC 45.040(h)(2) (providing that a party "is joined without further [B]oard action" when no timely objection is filed).

[13]     *See* 8 AAC 45.040(k) ("If claims are joined together, the [B]oard or designee will notify the parties which case number is the master case number."). Weaver raised an issue only about the 2010 injury, not the 2011 injury, in his appeal to this court.

saying "he's got facet, he's got disc, he's got now spinal stenosis." In Dr. Scoggin's opinion the multifactorial aspect of Weaver's pain made it more likely that the condition was degenerative. Dr. Scoggin explained that as people age their discs deteriorate, and that the process can be accelerated by a number of factors, "including obesity, age, genetic factors," trauma (including disc herniation), and "any sort of injury to the spine that's disruptive of the anatomy or structure."

Responding to ARCTEC's questions, Dr. Scoggin testified that based on the information he had reviewed, he thought the 2010 injury was the substantial cause of Weaver's disability and need for medical treatment after January 2014, which was the month he had estimated Weaver became medically stable as a result of the 2013 injury. To support this opinion Dr. Scoggin pointed out that Weaver had reported a specific activity in 2010 — putting heavy chains on a road grader and tightening them — and that from that time forward Weaver's pain complaints may not have completely resolved. Dr. Scoggin did not consider Weaver's surgery reasonable or necessary and said he would not attribute any need for the surgery to the 2010 injury.

The parties deposed Dr. Trescot and Dr. Teed. Dr. Trescot stated that a pain physician needs to assess a patient's mental health when considering treatment for pain. Dr. Trescot agreed (as a hypothetical) that she would "be concerned that there is an underlying issue that isn't being addressed" if a patient did not get relief from multiple types of treatment such as narcotics, anti-inflammatories, medial branch blocks, RFA, and surgery. And Dr. Trescot agreed that when a pain patient does not improve in spite of multiple treatments, it may be related to "untreated depression or anxiety," "substance abuse," or potential secondary benefits of a lack of improvement; she said that "[t]hose are usually things you would start looking for when patients don't get better with a treatment that you have identified."

Dr. Teed testified that when a patient does not improve after multiple types of treatment, "that's a red flag for functional overlay" and that treating physicians need to have information about substance abuse and the patient's mental health history. Dr. Teed would not give an opinion when asked whether psychosocial issues were "a large part of [Weaver's] ongoing pain complaints" because this asked for an opinion outside his specialty; he said he would "call for a consultation and psychologic and psychiatric and multidisciplinary evaluation on this claimant."

The Board held a two-part hearing on the merits of Weaver's claim. The first took place in March 2017 and featured four witnesses: Dr. Restad, Dr. Radecki, Weaver, and Weaver's father. The second was in July and had one rebuttal witness. Prior to hearing testimony in March the Board heard arguments related to procedural disputes but did not make oral rulings on the issues that are on appeal to us. Instead, the Board held a prehearing conference about three weeks after the hearing and ordered the parties to file short briefs about Weaver's request to cross-examine Dr. Johnston.

We summarize only that hearing testimony directly relevant to the issues on appeal. Dr. Radecki's testimony was generally consistent with his reports, and he was highly critical of Weaver's healthcare providers. Dr. Radecki's chief opinion was that Weaver's pain was mainly psychological in origin and not in his back, although he thought the pain might be related to Weaver's head injury. He testified that Weaver's case was "a very complex situation" because of the "known psychosocial problem[s]" documented in the medical records, including drug and alcohol use, monetary problems, a divorce, and a history of depression and anxiety. Dr. Radecki considered that Weaver's old head injury could affect his judgment or could make him more likely to have total body pain. Dr. Radecki considered Weaver's pain to be a "psychological condition" involving "the mind-brain interface with the rest of the body." Dr. Radecki did not feel it was inappropriate for him to testify about psychological issues because he

had some related training during his residency and because he could "give any opinion [he] want[ed]" as long as it was "substantiated."

The Board issued a decision in late October 2017 and decided that Weaver had not carried his burden of proof. The Board first considered the procedural issues it had not addressed at the hearing and decided that both Dr. Marble's EME report and Dr. Johnston's concurrences should be excluded from consideration by the Board. It then decided that no claim for benefits related to the 2010 injury was at issue at the hearing because Weaver had not filed a written claim specifically for that injury.

Turning to the merits, the Board decided Weaver had attached the presumption of compensability and that ARCTEC had rebutted it. The Board said ARCTEC "rebut[ted] the presumption with Dr. Radecki's opinion that [Weaver's] continuing need for medical treatment was caused by factors other than work, and Dr. Scoggin's opinion that [Weaver] suffered a soft tissue injury that had resolved by the time of Dr. Marble's . . . evaluation." The Board did not use Dr. Teed's opinions at the rebuttal stage.

Considering the third stage of the analysis, the Board gave little weight to Dr. Restad's opinions because in its view her "hearing testimony was contradictory and problematic." It also gave little weight to Dr. Kralick's opinions because he never testified. It gave little weight to Dr. Trescot's opinions because she only saw Weaver twice and her "opinions faltered on cross-examination."

In discussing Dr. Radecki's opinions, the Board said those opinions "were initially viewed with some skepticism," in part because Weaver's pain responses that Dr. Radecki noted "were not previously noted by other providers." It then summarized Dr. Radecki's opinions as well as those of Dr. Scoggin and Dr. Teed. The Board

afforded little weight to Dr. Teed's opinions, and gave "substantial weight" to Dr. Scoggin's and Dr. Radecki's opinions.

The Board thought Weaver's "alcohol abuse" was "a compelling aspect in this case," but it cited other psychosocial factors mentioned by Dr. Radecki that it considered relevant. The Board was troubled by Weaver's "lack of response to very extensive and prolonged treatment," listing the numerous treatments he had received, including the pain management regimen and numerous drugs. The Board noted the agreement between Drs. Radecki, Trescot, and Teed that when a claimant does not respond to multiple treatments, psychosocial factors need to be considered. The Board decided that the evidence showed Weaver's non-work-related factors were a more likely cause of his continuing pain and decided he had not proved his claim by a preponderance of the evidence.

Weaver appealed to the Commission, and the Commission first agreed with the Board's decision. The Commission affirmed the Board's decision that ARCTEC rebutted the presumption. The Commission also affirmed the merits of the Board's decision because in its view substantial evidence in the record, specifically Dr. Radecki's and Dr. Scoggin's opinions, supported that decision. The Commission decided the Board had made adequate findings, discussing issues related to Dr. Radecki's credibility.

Turning to the procedural issues, the Commission decided that the Board had appropriately handled the exclusion of Dr. Johnston's and Dr. Marble's reports. The Commission decided that Drs. Radecki and Scoggin "based their findings of medical stability not only on [Dr. Marble's] date for medical stability, but also on Mr. Weaver's lack of improvement for more than 45 days in 2014." The Commission considered the Board's "references to Dr. Marble's report" to be "incidental factors." The Commission wrote that "Weaver's right to cross-examine Dr. Marble and Dr. Johnston was also

properly protected by the Board's exclusion of those two items from the Board's own deliberations and conclusions."

Finally, the Commission agreed with the Board's interpretation of its regulation about joining claims. Relying on one of its own prior decisions, the Commission decided that the lack of a specific reference to the 2010 injury on the written claim from June 2014, together with the prehearing conference summary that identified the June 2014 written claim as the subject of the hearing, supported the Board's decision to limit the issues to the 2013 injury. According to the Commission ARCTEC was "never put on notice that benefits were sought arising out of the 2010 injury, nor what those benefits might be." Weaver appeals.

## III. STANDARD OF REVIEW

In an appeal from the Commission, we review the Commission's decision and not the Board's.[14] We independently review a Commission decision that substantial evidence supports the Board's findings of fact by independently reviewing the record and the Board's findings.[15] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[16] "Whether the quantum of evidence is substantial is a question of law."[17] "Whether the [B]oard made

---

[14] *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017) (citing *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1178 (Alaska 2014)).

[15] *Humphrey*, 337 P.3d at 1178 (citing *Shehata v. Salvation Army*, 225 P.3d 1106, 1113 (Alaska 2010)).

[16] *Id.* at 1179 (quoting *DeYonge v. NANA/Marriott*, 1 P.3d 90, 92 (Alaska 2000)).

[17] *Id.* (citing *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 630 (Alaska 2011)).

sufficient findings is a question of law that we review de novo."[18] We review an agency's interpretation of its own regulation under the reasonable basis standard.[19] "When we review the Commission's legal conclusions about the Board's exercise of discretion or legal rulings, we also independently assess the Board's rulings and in so doing apply the appropriate standard of review."[20]

## IV. DISCUSSION

### A. The Commission Correctly Concluded That ARCTEC Rebutted The Presumption Of Compensability.

Weaver argues the Commission erred in concluding that ARCTEC rebutted the presumption of compensability. He points out that in *Huit v. Ashwater Burns, Inc.*[21] we did not decide how the presumption analysis applies when another possible cause contributes to the disability or need for medical treatment. He contends that Dr. Radecki's opinion was not substantial evidence that could rebut the presumption. Weaver maintains that Dr. Radecki's opinion was "inconsisten[t]" and failed "to name a credible generator of Weaver's pain," which essentially meant Dr. Radecki pointed to an "unknown cause." He argues that Dr. Radecki's opinion that his continuing pain complaints were due to psychosocial factors was a psychological diagnosis Dr. Radecki was not qualified to make. ARCTEC responds that the Board and the Commission considered both the opinions of Dr. Scoggin and Dr. Radecki in deciding it had rebutted the presumption and that either opinion alone was adequate. In reply Weaver asserts that

---

[18]    *Pietro v. Unocal Corp.*, 233 P.3d 604, 611 (Alaska 2010) (alteration in original) (quoting *Leigh v. Seekins Ford*, 136 P.3d 214, 216 (Alaska 2006)).

[19]    *Eder v. M-K Rivers*, 382 P.3d 1137, 1140 (Alaska 2016).

[20]    *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

[21]    372 P.3d 904 (Alaska 2016).

the Board used both opinions to rebut the presumption so that "if one opinion fails they both fail to overcome the presumption."

As relevant to this appeal, Weaver sought TTD after January 15, 2014, and continuing medical benefits in his amended workers' compensation claim. ARCTEC denied that Weaver was entitled to TTD after January 15, 2014, or to any additional medical benefits after January 9, 2014, relying on Dr. Marble's opinions that (1) Weaver suffered "a temporary aggravation/exacerbation" of his non-work-related preexisting degenerative disc disease from his 2013 work activities; (2) Weaver was medically stable from the effects of the 2013 injury; and (3) any medical care related to Weaver's back pain after January 9 was necessitated by his non-work-related preexisting degenerative disc disease.

Weaver is correct that we did not decide in *Huit* how the 2005 workers' compensation amendments affected the second stage of the presumption analysis when there is a competing cause. We do not decide that issue here because ARCTEC offered substantial evidence that rebutted the presumption under pre-2005 case law. Because ARCTEC's evidence rebutted the presumption that work was a substantial factor in causing the disability, it necessarily rebutted a narrower presumption that work was the substantial cause.[22]

At the second stage of the presumption analysis the evidence is viewed in isolation and is not weighed.[23] To rebut the presumption under the pre-2005 analysis, an employer needed sufficient evidence "that either (1) provided an alternative explanation that would exclude work-related factors as a substantial cause of the

---

[22] *See id.* at 919 ("[S]omething cannot be 'the substantial cause' of a disability if it is not a cause at all.").

[23] *Pietro*, 233 P.3d at 611.

disability, or (2) directly eliminated any reasonable possibility that employment was a factor in causing the disability."[24]   Either Dr. Radecki's or Dr. Scoggin's opinion provided an explanation that if believed would exclude work-related factors as a substantial cause of Weaver's continuing disability and need for medical treatment.

Both Drs. Radecki and Scoggin diagnosed Weaver with non-work-related degenerative disc disease.  Dr. Scoggin diagnosed a soft tissue injury related to Weaver's work in July 2013, but he said the soft tissue injury would have resolved within a few months, and certainly by January 9, 2014, the date of Dr. Marble's EME.  This opinion provided an alternative explanation that excluded work-related factors as a substantial cause of Weaver's continuing disability and need for medical care after January 15, 2014.

Dr. Radecki did not think Weaver had suffered any work-related injury in 2013, so any need for medical treatment or disability was not work-related.  Dr. Radecki attributed Weaver's pain complaints to psychosocial factors or possibly to the traumatic brain injury from years before.  Weaver contends that Dr. Radecki lacked the expertise to make a psychological diagnosis, but at oral argument before us, Weaver agreed that a physical medicine and rehabilitation specialist like Dr. Radecki can properly consider psychosocial factors when diagnosing and treating a patient for pain.  Weaver's response suggests that his concern is not with Dr. Radecki's expertise but with the purpose of Dr. Radecki's statement.  We regard Weaver's argument as largely immaterial in any event.   Several of Weaver's own healthcare providers noted the existence of his psychosocial stressors, and Dr. Murphy specifically said the stressors were impacting Weaver's care.  Dr. Radecki did not make a psychiatric diagnosis but instead cited factors that other medical doctors considered when treating Weaver, so we consider

---

[24]     *Huit*, 372 P.3d at 917.

Dr. Radecki's expertise adequate to render an opinion about the influence of psychosocial factors on Weaver's pain.

Dr. Radecki's opinion that Weaver had degenerative disc disease that preexisted the 2013 injury report together with his opinion that Weaver's continuing pain could be attributed to psychosocial factors provided an explanation that if believed would exclude work-related factors as a substantial cause of Weaver's continuing disability and need for medical treatment. We therefore hold that the Commission correctly determined that ARCTEC rebutted the presumption.

**B. The Commission Correctly Concluded That Substantial Evidence In The Record Supported The Board's Decision.**

Weaver argues that the Board made a legal error when it "determined that Weaver's lack of improvement despite treatment undermined his proof of causation." As to the facts, he contends that his symptoms "did improve with appropriate treatment" because his pain decreased after the surgery such that he reduced his medication dosage by half. He argues that "the Board required [him] to show improvement of his symptoms in order to meet his burden regarding causation" and that this is erroneous because some work-related conditions by their nature will never improve, making improvement irrelevant to causation.

Weaver misreads the Board's decision. The Board's statement in essence summarized what several doctors had said. Weaver underwent multiple treatments for his back pain, some of which had a diagnostic function as well. For example Dr. Trescot explained how medial branch blocks are used to diagnose facet-related pain. Weaver's responses to the different treatments — first reporting improvement and then reporting little or no improvement in his condition — made the pain difficult both to treat *and* to diagnose. Without a good idea of what underlying condition caused the pain, it was difficult for the doctors or the Board to determine causation. Weaver's responses to

different treatments prompted Dr. Scoggin to label Weaver's pain "multifactorial" and conclude that the main reason for the pain was Weaver's degenerative changes in his spine. Dr. Scoggin based this opinion on the following factors: Weaver (1) had some response (mostly transitory) to many types of treatment, (2) had no complete relief with any one type of treatment (not even the surgery), and (3) was unable to identify a specific activity that might have caused a change in his lower back (a disc herniation, for example) that would explain the increased pain. Additionally, Weaver reported some improvement after the surgery even though his records did not consistently document symptoms associated with lumbar spinal stenosis.

Weaver's theory is that spinal stenosis was the real cause of his pain and that the heavy labor he did in 2013 was the substantial cause of this condition. Dr. Scoggin agreed that "wear and tear" can be a factor in causing spinal stenosis, but he did not think there was "anything that's quantifiable or definable" to determine what part of the stenosis was caused by Weaver's job. Dr. Scoggin listed a number of other factors that could contribute to spinal stenosis, including a traumatic event, age, and genetics. He also testified that Weaver's weight was a contributing factor to the back condition, although he did not identify that factor specifically with the spinal stenosis. Dr. Scoggin identified the earlier trauma Weaver experienced in "two big accidents" (the 1993 motor vehicle accident that "tore [Weaver's] aorta" and the later accident that resulted in removal of Weaver's spleen) when listing possible causes of the degenerative changes in Weaver's spine.

As to Weaver's contention that the Board erroneously determined his condition did not improve with any treatment, substantial evidence in the record supports the Board's decision. Although the medical records indicate that Weaver's prescribed dose of narcotics decreased following surgery, the pain level he reported after the surgery was similar to or higher than pain levels he had reported earlier in his treatment. In

August 2013 Weaver reported to Dr. Restad pain that was three out of ten. In late 2014 Weaver reported to Algone an average pain level of five. In May 2017, more than ten months after the surgery, Weaver reported an average pain level of three to five, with medication. This is not a dramatic improvement over a reported average of five earlier. And according to Dr. Teed, Weaver reported that the surgery had reduced sharp pains in his back but that ongoing dull pain continued to be disabling.

Weaver discusses past Board decisions in which Dr. Radecki's opinions were given little weight, but we agree with ARCTEC that the Board can decide in an individual case that Dr. Radecki's opinions are persuasive and entitled to substantial weight.[25] As a general matter, if an employer's evidence is sufficient to rebut the presumption and if the Board later decides that evidence is entitled to more weight, then substantial evidence in the record supports the Board's decision.[26] Because the Board gave the most weight to Dr. Radecki's and Dr. Scoggin's opinions, those opinions provided substantial evidence to support the Board's decision.[27]

---

[25] *See* AS 23.30.122 ("The board has the sole power to determine the credibility of a witness. A finding by the board concerning the weight to be accorded a witness's testimony, including medical testimony and reports, is conclusive even if the evidence is conflicting or susceptible to contrary conclusions.").

[26] *See Cowen v. Wal-Mart*, 93 P.3d 420, 426 (Alaska 2004) ("The evidence that was sufficient to rebut the presumption of compensability was also sufficient to support the [B]oard's determination that [the claimant] failed to show by a preponderance of the evidence that her injury was work-related.").

[27] We reject Weaver's argument that the Board failed to make adequate findings about inconsistencies in Dr. Radecki's testimony and about the outcome of Weaver's surgery. We also reject his argument that the Board was required to make further findings than it did about the lay testimony. In our view, the Board's findings were more than adequate to permit our review.

### C. The Board Did Not Violate Weaver's Due Process Rights.

In *Commercial Union Cos. v. Smallwood* we considered whether an employer had waived its right to cross-examine a claimant's doctors about their medical opinions.[28] The employer had the doctors' written reports at least 30 days before the hearing but had not deposed the doctors.[29] Relying on an earlier case, we held that in the absence of a Board regulation delineating when a party waived cross-examination of a medical opinion's author, the employer had not waived his right to cross-examine the doctors.[30] The Board later adopted a regulation about cross-examining the authors of medical opinions.[31]

It is undisputed that Weaver did not waive his right to cross-examine either Dr. Marble about his EME report or Dr. Johnston about his concurrence in that report. In its written decision, the Board decided it would exclude these reports from its own consideration but did not strike them from the record.[32] On appeal to the Commission, Weaver argued that the Board violated his due process rights as recognized in *Smallwood* because the Board's decision relied on the opinions of Drs. Scoggin, Radecki, and Teed, all of whom had in turn relied on the opinions of Drs. Marble and Johnston, the doctors he had not been able to cross-examine. The Commission decided that "none of these

---

[28]  550 P.2d 1261, 1264-67 (Alaska 1976).

[29]  *Id.* at 1262-63.

[30]  *Id.* at 1264-66 (citing *Emp'rs Commercial Union Ins. Grp. v. Schoen*, 519 P.2d 819, 823-24 (Alaska 1974)).

[31]  8 AAC 45.052.

[32]  Because the Board does not require the parties to file witness lists until "five working days" before a hearing, the parties may not know until shortly before a hearing whether they will have the opportunity to cross-examine doctors. 8 AAC 45.112.

doctors based their findings of medical stability solely on Dr. Marble's report or on Dr. Johnston's 'check-the-box' form," viewing any reference to Dr. Marble's report as "incidental" to the other doctors' conclusions.

Weaver argues that the Commission's decision was erroneous and repeats his argument that the Board violated his right to cross-examination. ARCTEC contends that Weaver's due process rights were adequately protected by the Board's exclusion of those medical reports from its own decision making and by Weaver's ability to cross-examine both Dr. Scoggin and Dr. Radecki. In reply Weaver points out that Dr. Scoggin used Dr. Marble's examination date as the date of medical stability; he contends that he was unable to ask Dr. Marble the basis for his opinion and cross-examine him about continuing pain. Weaver lists the multiple references Dr. Scoggin made to the excluded reports and notes that Dr. Radecki and Dr. Teed referred to them as well.

Under the facts of this case, we agree with the Commission that Weaver's due process rights as recognized in *Smallwood* were adequately protected. Neither Dr. Radecki nor Dr. Scoggin relied exclusively, or even primarily, on Dr. Johnston's or Dr. Marble's excluded opinions. In fact, in his first EME report, Dr. Radecki opined that Weaver had reached medical stability from the effects of his July 2013 work injury by November 2013, well before Dr. Marble's January 9, 2014 EME. Dr. Radecki's identification of November 2013 was influenced by a part of Dr. Johnston's medical record that Weaver did not object to, specifically a chart note from early November 2013 in which Dr. Johnston discussed with Weaver the possibility of returning to full duty work if it was available. At the hearing Dr. Radecki indicated his "full agreement" with Dr. Scoggin and Dr. Marble that "being generous" Weaver was medically stable by January 9, 2014. Weaver had ample opportunity to cross-examine Dr. Radecki at the hearing about this opinion and why his opinion about the date of medical stability might have changed.

Dr. Scoggin diagnosed Weaver with degenerative changes in his spine and thought Weaver suffered only a soft tissue injury related to his work for ARCTEC in July 2013. Dr. Scoggin testified that "soft tissue strains tend to resolve in a period of a few months," adding that by January 2014 Weaver had been medically stable for "more than a few months." This testimony implies that Dr. Scoggin, like Dr. Radecki, would have placed the date of medical stability from the July 2013 injury earlier than January 9, 2014. Weaver had ample opportunity to cross-examine Dr. Scoggin about the basis of his opinions, and in fact did so. Dr. Scoggin's report and testimony demonstrate that he independently assessed the medical evidence to give an opinion about medical stability and did not simply rely on Dr. Marble's excluded EME report to diagnose Weaver or to estimate the date he became medically stable. We therefore agree with the Commission that "[w]hile it might have been prudent for ARCTEC" to have presented Drs. Marble and Johnston as witnesses, Weaver's due process rights as recognized in *Smallwood* were not violated because the doctors the Board relied on independently assessed the medical evidence and reached their own conclusions about medical stability.

Although we affirm the Commission's decision, we note that the process the Board used here is potentially problematic. Even though Weaver objected to use of Dr. Marble's EME report and Dr. Johnston's form response at the outset of the hearing, the Board made no ruling on the objection until it issued its final decision, after the parties had completed both the hearing on the claim and their written arguments. Objections to evidence should be decided promptly because admissibility or exclusion of evidence can affect litigation strategy, including questioning witnesses. Here, for example, ARCTEC referred to Dr. Marble's report when questioning Dr. Radecki in spite of Weaver's objection. And Dr. Radecki compared his own examination of Weaver to Dr. Marble's to illustrate points he was making. The Board should rule on objections

like Weaver's promptly so that the parties can make informed decisions about presenting their cases.

Finally, we observe that under Alaska Evidence Rule 703 experts can use inadmissible evidence to form opinions as long as it is the type of evidence experts in the field reasonably rely on. While the Board "is not bound by common law or statutory rules of evidence,"[33] we note that Dr. Scoggin and Dr. Radecki could, consistent with this rule, use inadmissible evidence to form an opinion about medical stability. While Evidence Rule 703 "is not intended merely to provide a conduit for the admission of otherwise inadmissible evidence,"[34] in this case Dr. Radecki and Dr. Scoggin did not merely provide a conduit for Dr. Marble's opinion. Their testimony showed their independent assessment of Weaver's condition in rendering their opinions.

**D.     The Commission Correctly Concluded That The Board Properly Applied Its Regulation About Joinder.**

Weaver maintains that the Board should have considered a claim related to his 2010 injury because he filed a petition to join in October 2014, listing his 2010 and 2011 injuries with ARCTEC; the Board joined the two cases; and the 2014 case number was designated the master case number. He points out that ARCTEC clearly anticipated that the 2010 injury would be considered at the hearing because in 2015 it began asking its doctors to evaluate the effects of the 2010 injury on Weaver's condition. Additionally, ARCTEC asked Dr. Scoggin to give his opinion about the 2010 injury when it questioned him at deposition, and Dr. Scoggin indicated then that the 2010 injury was the substantial cause of Weaver's need for medical treatment. ARCTEC responds that the Board and Commission were correct because Weaver never filed a separate

---

[33]     AS 23.30.135(a).

[34]     *Estate of Arrowwood v. State*, 894 P.2d 642, 647 (Alaska 1995).

written claim related to the 2010 injury, asserting that "a claim cannot be joined if it does not exist."

The Board applied its pleading regulation in this case; that regulation requires a "separate claim . . . for each injury for which benefits are claimed, regardless of whether the employer is the same in each case."[35] The Board also cited its regulation about hearings, which directs that a hearing cannot be scheduled "unless a claim . . . [has been] filed."[36] It is undisputed that Weaver did not file a written workers' compensation claim for the 2010 injury until after the Board's decision in this case, and that claim was pending before the Board at the time of oral argument before us. Weaver used the Board's regulation about joining parties,[37] which "does not specify how to join claims or when joinder of claims is permitted or required."[38]

We review an agency's interpretation of its own regulation using the reasonable basis standard and its application of that regulation to the facts of a case for abuse of discretion.[39] Here, the Board interpreted its regulations as requiring a separate written claim for each injury, even when the underlying cases had been joined. This is not unreasonable because it gives all parties notice of precisely what is at issue as they prepare for a hearing. Likewise, it was within the Board's discretion to refuse to hear Weaver's claim for compensation related to the 2010 injury and to defer that question until Weaver had filed a written claim detailing exactly what he sought. Because Weaver

---

[35]    8 AAC 45.050(b)(5).

[36]    8 AAC 45.070(b).

[37]    8 AAC 45.040.

[38]    *Barrington v. Alaska Commc'ns Sys. Grp., Inc.*, 198 P.3d 1122, 1129 n.28 (Alaska 2008).

[39]    *Eder v. M-K Rivers*, 382 P.3d 1137, 1140 (Alaska 2016).

has now filed a claim related to the 2010 injury, the parties can litigate that claim before the Board.

## V. CONCLUSION

We AFFIRM the Commission's decision.